Downey, JucUge,
delivered the opinion of the court:
This case was decided March 17, 1924, on findings of fact and a conclusion of law adverse to the plaintiff, with an opinion. A motion for a new trial was filed by the plaintiff in which it was represented that, if given an opportunity, he could present additional and material evidence bearing on the point on which the case was turned, and, influenced somewhat by the apparent equities of the case, the court granted a new trial and ordered also “that the parties be permitted to submit additional evidence limited to questions relative to the entry upon plaintiff’s land and the authority therefor.”
Additional evidence has been submitted by both parties consisting, on the part of the plaintiff, of the testimony of Major Stevenson, referred to in the findings, together with certain communications, recommendations, and orders, and on the part of the defendant, of the testimony of Major Supplee, construction quartermaster at Camp Jackson. The findings as now stated are in the main the same as those made upon the former trial of the case, to which no serious objections were made, with the addition, largely in response to plaintiff’s request, of such facts appearing from the additional evidence as seem material.
Since the case as now presented involves a review of the former holding of the court in the light of the additional evidence submitted, it is thought that the question involved may be most satisfactorily presented by repeating here the former opinion of the court, which was as follows:
*127 “The conclusion necessarily to be reached in this case renders unnecessary the repetition or consideration in detail of many of the facts set out quite fully in the findings. The several questions which might otherwise be for consideration are subordinated to the one, because that one is controlling.
“The plaintiff had entered into a contract of purchase for a large tract of land in Richland County, S. C., through which flowed a bold, clear stream of water, called Gills Creek, and on which, fed by said stream, was a large pond in which, by a dam, the waters were impounded and made available for a water power. There was an old mill near the dam which in former years had been operated by water power.
“The United States located a camp for the mobilization and training of soldiers, called Camp Jackson, abo'ut 6 miles above plaintiff’s land, and in 1917 began dredging Gills Creek for the purpose of draining swampy areas and eliminating mosquitoes, but afterwards concluded-to make of it, a sewage canal through which the effluent from the disposal plant at the camp was to be carried off.
“After crossing plaintiff’s north line with the work of dredging out the creek, which to that point had followed the stream, a right of way 100 feet wide was surveyed across plaintiff’s land, diverging from the stream and continuing away from the stream and entirely away from and around the mill pond, through which a canal was dredged which reentered the stream some two or three hundred feet below the mill dam. Aside from the appropriation of the hundred-foot right of way, which contained seventeen acres, the waters of the creek were diverted into this new canal and the water power destroyed. Other conditions recited in the findings need not be repeated.
“In 1917, when this camp was about to be established and it was thought that one of the first requisites was to improve sanitary conditions by draining to eliminate mos-q’uito.es, citizens of Columbia, interested in procuring the location* of the camp, solicited and procured from owners of lands on Gills Creek signatures to instruments in writing authorizing entry upon the lands of the signers for the purpose of draining, and one of these instruments, set out in Finding IX, was signed by the then owner of this land, but it was not placed on record, and the plaintiff had no knowledge of it at the time he contracted the purchase of the land. Before that instrument was signed by the then owner foreclosure proceedings had been instituted to foreclose heavy mortgage liens, lis pendens notice had been properly *128 recorded and a receiver appointed, who as such was in possession of the land.
“It is quite easy to conclude that this instrument was never intended, if otherwise valid, to authorize what was done on plaintiff’s land, and there are besides the questions as to its validity under the circumstances stated and without record, but these questions, possibly for determination under other circumstances, are wholly immaterial under the view which must be taken of this case.
“ If there is a case presented proper for our consideration it is a case of a £ taking,’ a taking of plaintiff’s land, and a taking of his water power by diversion of the stream from its natural bed to the newly cut canal, a class of case as to which the applicable r'ules to which we must resort have become quite well understood.
“In such circumstances the action of which we have jurisdiction is founded upon an implied contract, a contract arising out of the taking by the United States of the property of another, coupled with the provision as to just compensation found in the fifth amendment to the Constitution, the implication of a promise to pay naturally arising.
“ But the circumstances may destroy the implication, eliminate a necessary element of the implied contract, rebut the promise to pay, and we are forced to the conclusion that such is the case here. Stated in few words, it is the settled law of such cases that if the United States is acting under a claimed right there can be no implication of a promise to pay. Title or right asserted by the United States is wholly inconsistent with any presumed intention to pay some one else for it. And it is immaterial whether the assertion of right is well founded or not. The assertion of the right, though unfounded, negatives the presumption of an intention to pay as thoroughly as if well founded. Proven unfounded, the status of implied contract is not restored, but a tort results.
“We have predicated our conclusion on the testimony of the officer in charge of this work for the Government^ which, being undisputed, is converted into a finding of fact as appears in Finding XY.
“ The instrument set out in Finding IX falls far short in our judgment, especially under the circumstances recited, of vesting in the United States any right or authority to do what it did, but the officer representing the United States in the matter believed that it was properly executed and with authority and upon its ‘ good faith,’ as he puts it, he acted in entering upon plaintiff’s real estate. The case seems to be clearly within the rule of Tempel v. United States, 248 U. S. 121, and other cases not necessary to review.
*129 “ It is but fair to plaintiff to say, if perchance it may in any way benefit him, that it clearly appears that he has been seriously damaged, and good conscience demands that he have compensation, not perhaps for all that he claims by way of ‘ damages,’ but for that which the United States took. The rule, which seems to us to preclude a judgment at our hands, is not in its general application to be criticized, for it is no doubt sound, but, to adopt the characterization of the Supreme Court in other instances, it certainly does make of this a ‘hard case,’ for under its operation, assuming that we are right in its application, we are precluded from awarding any compensation, however clearly it may appear that there should be such an award.
“It is our duty to dismiss the petition, and we have so ordered.”
Assuming that we were right in the conclusion then reached, does the additional evidence now require or justify a change in that conclusion? Naturally the question revolves around the status of Captain Brown, thé assistant constructing quartermaster who was in charge of this work, and the effect upon plaintiff’s case of the fact that he, in directing the entry upon plaintiff’s land and the work done thereon, acted on the belief that there was a granted right so to do.
The record upon the former trial did not attempt to trace the authority of Captain Brown. It appeared simply that he was in charge of the work for the United States, being-silent as to the scope or source of this authority. The additional testimony shows the source of his authority and its absolute character so far as this particular work was concerned.
This was a war-time project, one of the adjuncts of the many instrumentalities created for the training of an army, and it is a matter of common knowledge of which the courts will take notice that the magnitude of war-time operations necessitated, and hence justified, a delegation of authority. Without it things vitally necessary could not have been accomplished because beyond the human capacity of a single authoritative head, and to the extent that that condition prevailed with subordinate authorities down the line the same necessity for delegation of authority existed.
*130 In the War Department was a construction division, of which General Marshall was the head, subordinate, of course, to the Secretary of War, and under General Marshall was Major Stevenson, assigned supervision of many camps and cantonments, Camp J ackson included. Subordinate to Major Stevenson was the constructing quartermaster at Camp Jackson, in full charge of all construction work authorized at that camp, and under him, as his assistant, was Captain Brown, to whom he delegated absolute authority over the dredging and drainage work. (Finding XIII.)
It is likely that the Secretary of War, on recommendation, approved the location of Camp J ackson at this particular point. It was necessary that he or his assistant, acting for him, allot necessary funds from available appropriations, and the Assistant Secretary did,., pro forma, no doubt, on recommendation submitted to him, approve the proposed expenditure for the continuance of this drainage work. But it does not appear and no doubt is not a fact that the Secretary or his assistant had any knowledge that entry upon plaintiff’s land, or otherwise, was involved in the prosecution of this work. The fact no doubt is that while the constructing quartermaster at the camp had some sort of an understanding that the work would cross plaintiff’s land, and as a matter of permissive right, Captain Brown, the constructing quartermaster’s assistant, was the first person in the descending chain of authorities who had actual knowledge of the situation and was in position to deal with it understandingly.
The question of authority seems to be of paramount importance in determining the question under consideration. In Baltimore & Ohio Railroad v. United States, 261 U. S. 592-596, it is said, “ It is essential that the officer or agent with whom it (the agreement) was entered into should not merely have been holding under the Secretary of War or the President, but that he should have been acting within the scope of his authority.” This was a Dent Act case, involving an alleged agreement under the provisions of that act, but the principle is of general application. In United States v. North American Company, 253 U. S. 330-333, a case of alleged “taking,” it is said, among other things *131 material, that “ In order that the Government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power.”
It was Captain Brown, acting under delegation of full authority as to this drainage work, who, with the force under him, entered upon and “ took ” plaintiff’s property. No one had given him any direction whatever with reference to plaintiff’s property. He dealt with it under the general authority delegated to him as to the prosecution of this work.
If we may conceive the right of the plaintiff to recover from the United States as for a taking, it must, in view of the last quoted principle, be predicated upon the conclusion that Captain Brown, in taking physical possession of plaintiff’s property, had authority so to do. We believe he had such authority and that if he had exercised it’ without claim of right on the part of the United States an implied obligation to make just compensation would have resulted,, but if he had authority to bind the United States by his entry the fact that, he had such authority would equally serve to prevent a recovery under the rule of the Tempel ease, 248 U. S. 121, if he assumed to enter as a matter of right.
The additional evidence submitted upon this trial of the case serves r-ather than otherwise to strengthen the conclusion before reached, and we again conclude that under the Tempel case, supra, it is our duty to dismiss the case for want of jurisdiction.
Graham, Judge; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.