TEMPEL *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 29.　Argued November 5, 1917.—Decided December 9, 1918.

Not knowing that certain land on the Chicago River had become submerged through excavations privately made without the owner's consent, the Government, believing it to be within the *de jure* stream,

and not intending to exercise the power of eminent domain, dredged the submerged land, claiming then and thereafter that it did so under the power to improve navigation. *Held*, that there was no ground for implying a promise to compensate the owner; that his cause of action, if any, was in tort; and that an action by him against the United States was not within the jurisdiction of the District Court under the Tucker Act. *Hill* v. *United States*, 149 U. S. 593, followed. *United States* v. *Lynah*, 188 U. S. 445, and *United States* v. *Cress*, 243 U. S. 316, distinguished. P. 128.

Reversed.

THE case is stated in the opinion.

*Mr. Thomas B. Lantry*, with whom *Mr. Timothy F. Mullen* was on the briefs, for plaintiff in error:

A riparian owner may maintain his bank in its original condition, or restore it.

Prescription seems to be the test of determining whether the owner loses his right to compensation.

The public has no proprietorship in soil under small streams which are navigable only in a modified sense, for the floatage of logs and lumber, as it has under navigable waters at common law, where the tide ebbs and flows.

The statute of limitations does not run against the landowner's action for a taking until the work has been completed.

Land is not taken, in the meaning of the Fifth Amendment, until compensation is paid and the title passes from the owner. The filing of the petition for compensation is an acceptance of the taking, and the right of action accrues upon such acceptance.

The right of the public to improve the navigability of a stream without compensation is confined to the natural bed.

The commencement of a suit for damages is the acceptance of the taking of the property held for public use. In this case it is not questioned that the title was in the plaintiff, and that the Government had taken his prop-

erty for public use, nor was the value in dispute. An implied contract arose. *Great Falls Mfg. Co.* v. *Garland,* 124 U. S. 583, 597, 598; *Great Falls Mfg. Co.* v. *United States,* 112 U. S. 645, 656; *United States* v. *Lynah,* 188 U. S. 445, 463; *United States* v. *Welsh,* 217 U. S. 333; *United States* v. *Grizzard,* 219 U. S. 180.

*The Solicitor General* for the United States:

The Chicago River being a navigable stream in its natural state, there was no taking, because the submerged lands were subject to the paramount right of the Government to improve navigation.

In improving navigation the Government was not confined to the channel shown by the survey of 1837, but might dredge any portion of the river bed.

Such injury, if any, as claimant has suffered in this case was occasioned by the act of his lessee, and the remedy is in an action against him.

The District Court correctly held that it was without jurisdiction under the Tucker Act, because the suit was instituted more than six years after the alleged right of action accrued.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The Chicago River, its branches and forks lie wholly within the State of Illinois.[1] Their aggregate length is about 35 miles. Originally the stream was a sluggish creek, nearly stagnant during much of the year and, in part, navigable only for row boats and canoes or for

---

[1] The character of the river and rights incidental thereto have been frequently considered by this court. *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, 437; *Harman* v. *Chicago,* 147 U. S. 396; *West Chicago Street R. R. Co.* v. *Chicago,* 201 U. S. 506, 520.

floating of. logs.   The United States surveyed the river in 1837, but made no improvement above its mouth until 1896.   Before the latter date, however, extensive improvements had been made from time to time by the city and by riparian owners.   The river had become the inner harbor of Chicago and, measured by its tonnage, was one of the most important waterways of the globe.   In number of arrivals and departures of vessels it led all the harbors of the United States.   In tonnage it was second only to New York.[1]

In 1896 Congress made an appropriation "For improving the Chicago River, in Illinois, from its mouth to the stock yards on the South Branch and to Belmont avenue on the North Branch, as far as may be permitted by existing docks and wharves, to be dredged to admit passage by vessels drawing sixteen feet of water."   Act of June 3, 1896, c. 314, 29 Stat. 202, 228.   This act was amended by the Act of June 4, 1897, c. 2, 30 Stat. 11, 47, which, as interpreted by the War Department, permitted a slight widening of the stream in certain places.   The General Assembly of Illinois by resolution of April 22–23, 1897, [Laws, 1897, p. 308] gave assent to the United States' acquiring by purchase or condemnation "all lands necessary for widening the Chicago river and its branches." In 1899 Congress directed a survey with a view to creating a deeper channel and adopting 21 feet "as the project depth for the improvement in lieu of that fixed by the Act of June third, eighteen hundred and ninety-six." Act of March 3, 1899, c. 425, 30 Stat. 1121, 1156.   No widening beyond the banks of the *de jure* stream was specifically authorized by this act, nor by any subsequent act.   From time to time other appropriations were made by Congress for these improvements of the river, and work

[1] Reports, War Department, Engineers, for 1893, pp. 2794–2804; for 1897, pp. 2793–2801; for 1900, pp. 3865–3871; for 1914, pp. 1157–1160; for 1916, pp. 1350–1354.

was carried on thereunder.[1]  About 12.5 miles of the river was improved by the Government; and of this about 5 miles consisted of that part of the North Branch which lies between the main river and Belmont Avenue.

Early in 1889 Tempel became the owner of certain land on the bank of the North Branch below Belmont Avenue. He leased his land for a brick yard; and by the terms of the lease the lessee was permitted to dredge the bottom of the river in front of the premises for the purpose of making brick from the clay thereunder.  But the lessee was directed not to interfere with the upland; and he covenanted to deliver up the premises in the condition in which they were demised.  Nevertheless, from time to time during a period of five years between 1889 and 1899, the lessee dug away, to a depth of from 6 to 14 feet, a large strip of the upland, extending in some places to a considerable width.  In its natural state the stream opposite the plaintiff's property varied in width from probably fifty to a hundred and fifty feet, and could be used only for floating logs and for travel by row boats or canoes; but before 1889 riparian owners had dug a channel and possibly greatly widened the stream; and schooners navigated to a point beyond Belmont Avenue. Between 1890 and 1899 boats drawing 5 to 8 feet of water were navigating the North Branch up to Belmont Avenue.  In 1896 the river in front of Tempel's property was in varying depths of from 6 to 14 or 15 feet.

The United States did not do any dredging in front of

---

[1] Act of July 1, 1898, c. 546, 30 Stat. 597, 632; June 6, 1900, c. 791, 31 Stat. 588, 626; June 13, 1902, c. 1079, 32 Stat. 331, 363, which authorized the construction of turning basins, but the one in the North Branch was constructed at a point considerably below the land in controversy; March 2, 1907, c. 2509, 34 Stat. 1073, 1102; May 28, 1908, c. 213, 35 Stat. 429.

Reports, War Department, Engineers, for 1899, pp. 2826–2833; for 1900, pp. 3784–3788.

Tempel's property until 1899.  Then it dredged a channel
to the depth of 17 feet, about 30 feet wide—the excavation
being made wholly in the then bed of the stream as sub-
merged.  Its next dredging there was in 1909, when this
channel was deepened to 21 feet and widened to 60 feet,
the excavation being again made wholly in the then bed
of the stream as submerged.  All of the dredging, both
in 1899 and in 1909, which was not within the bed of the
river in its natural state, was done within the limits of
the strip of upland which had been submerged through
the dredging done by the lessee prior to 1899.  During
the period from 1889 to 1899, the stream in front of
Tempel's premises was in constant and increasing use
for the purpose of public navigation.  The Government
does not appear to have had knowledge of the fact that
dredging had been done before 1899 by the lessee without
the consent of Tempel or that the river had been widened
by excavation.  The reports of the Secretary of War show
that he never specifically authorized, for the purpose of
widening the river, the appropriation of any of the prop-
erty herein involved and that the Government believed,
when it dredged in front of Tempel's property in 1899
and again in 1909, that the submerged land, in which
the dredging was done, was either a part of the natural
bed of the river, or that it had been dedicated by the
owner for purposes of navigation, or that it had in some
other manner become a part of the *de jure* stream.[1]  No

[1] Reports, War Department, Engineers, for 1899, pp. 2828–2833;
for 1900, pp. 3785–3788; for 1901, pp. 2993, 2995; for 1905, p. 545,
show that, in the dredging under the project of 1896, the effort had
been to secure title to all property necessary for the proposed develop-
ment and that it was believed that (with exceptions not here material)
this had been done.  The property here involved was not included in
the land which it was proposed to acquire.  The reports also show that
the Government was not aware that there was any property of a pri-
vate owner which it was necessary to acquire in order to make the
further improvement according to the 21-foot project; and in the

objection was made by Tempel, until 1910, to the use, for navigation, of the river in front of his property; and he did not file any complaint as to the dredging of 1899. He had no knowledge, until 1910, of the dredging which had been done by his lessee, nor of that done by the Government.

Promptly after learning of the dredging, Tempel demanded of the Government possession of that part of the land submerged which had formerly constituted a part of his upland. The demand was refused; and in 1911 he brought, in the District Court of the United States for the Northern District of Illinois, this suit, under the Tucker Act (Judicial Code, § 24, par. 20), to recover the value of property which he claimed had been taken by the Government. The complaint alleged that the river in front of his premises was, at the time he acquired the same and theretofore, a creek used only for surface drainage and was "not a navigable stream either in law or in fact"; that the Government "in the latter part of the year 1909 completely excavated a channel through the same" for the purpose of making said North Branch navigable; and that it holds possession thereof by virtue of the resolution of the General Assembly of Illinois above referred to; and that the reasonable value of the property taken was $10,000. The complaint did not refer either to the dredging done before 1889, when Tempel acquired the property, or to that done between 1889 and 1899 by Tempel's lessee, or to that done in 1899 by the Government. The answer denied that the stream in front of

accounting of the division of funds between different objects none were assigned to the securing of land for widening the river. Reports, War Department, Engineers, for 1907, p. 627; for 1908, p. 672; for 1909, p. 709; for 1910, pp. 784–785; for 1911, p. 842; for 1912, p. 1009; for 1913, p. 1119; for 1914, pp. 1157–1160. Nowhere does it appear that the Secretary of War ever authorized the taking of the property involved in this suit.

Tempel's land was non-navigable when he purchased it or theretofore; asserted that all excavations by the Government were made in the center of the stream and were for the purpose of improving navigation; and denied that it had taken any of Tempel's property under the resolution of the Illinois Assembly or otherwise.

The trial court found as a fact, "That by reason of the changes in said river as aforesaid, the difference between the value of the premises of the petitioner at the time when he purchased the same as aforesaid, and the value of the same at the time that the demand as hereinbefore set forth was made, less the cost of reclaiming the same, were he entitled to make reclamation thereof, is $7,547.00." As conclusions of law the trial court found that the North Branch was navigable in its natural state; that it was navigable in fact as early as 1889; that Tempel, having failed to complain of the use by the public of the stream in front of his property for a period of at least ten years prior to the first dredging by the United States, was estopped from thereafter disputing the navigability of the river; and that the river being then a navigable stream, the dredging of the bed in 1899 and in 1909 did not constitute a taking of Tempel's property within the meaning of the Fifth Amendment. Judgment was entered for the United States; and the case comes here on writ of error.

*First.* This is a suit, like *United States* v. *Lynah,* 188 U. S. 445, and *United States* v. *Cress,* 243 U. S. 316, to recover the value of property taken by the Government in making a river improvement. The property alleged to have been taken is land, part of which lies within the 30-foot channel first dredged by the Government in 1899; the balance within the additional 30 feet dredged by it in 1909, when the channel was widened to 60 feet; and all of which formed part of the river bed and was submerged when the Government commenced its improvement and has been since. But the property of Tempel,

if any, which the Government has taken, is only the right to keep his land submerged, to navigate over it, and to improve it further for purposes of navigation. This right in the land the Government claimed and claims that it already possessed at the time when it dredged on the property in question; and it is the same right which the Government possesses in that portion of the present river bed lying within the original meander lines and which originally constituted the whole river bed. Under the law of Illinois, neither the United States nor the State owns the lands under a navigable river. Riparian owners own the fee to the middle of the stream, *St. Louis* v. *Rutz*, 138 U. S. 226, 242; subject to the paramount right of the Government to use the same and to make improvements therein for purposes of navigation, without the payment of compensation, *West Chicago Street R. R. Co.* v. *Chicago*, 201 U. S. 506, 520; *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 62; *Willink* v. *United States*, 240 U. S. 572, 580. Included in such permissible improvement is dredging for the purpose of deepening the channel, *Lewis Blue Point Oyster Co.* v. *Briggs*, 229 U. S. 82. It is only this right to use and improve for purposes of navigation that the Government claims here, a right which the Government undoubtedly possessed, if the land in question had been a part of the bed of the *de jure* stream, as was supposed.

If the plaintiff can recover, it must be upon an implied contract. For, under the Tucker Act, the consent of the United States to be sued is (so far as here material) limited to claims founded "upon any contract, express or implied"; and a remedy for claims sounding in tort is expressly denied. *Bigby* v. *United States*, 188 U. S. 400; *Hijo* v. *United States*, 194 U. S. 315, 323. As stated in *United States* v. *Lynah*, 188 U. S. 445, 462, 465: "The law will imply a promise to make the required compensation, where property to which the government asserts no title,

is taken, pursuant to an act of Congress, as private property to be applied for public uses"; or in other words: "Whenever in the exercise of its governmental rights it takes property, the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor." But in the case at bar, both the pleadings and the facts found preclude the implication of a promise to pay. For the property applied to the public use is not and was not conceded to be in the plaintiff.

*Second.* The answer, specifically denying that the United States has taken plaintiff's land, excavated a channel through it, and claims possession thereof under the resolution of the Illinois Assembly or otherwise, asserts that in 1909 it did "excavate a channel in the Chicago river in the center of the stream and now claims possession thereof for the purpose of making more navigable the north branch." The findings of fact made by the trial court (amplified by the reports of the Secretary of War, of which we take judicial notice) show that the Government claimed at the time of the alleged taking and now claims that it already possessed, when it made its excavation in 1909, the property right actually in question. It is unnecessary to determine whether this claim of the Government is well-founded. The mere fact that the Government then claimed and now claims title in itself and that it denies title in the plaintiff, prevents the court from assuming jurisdiction of the controversy. The law cannot imply a promise by the Government to pay for a right over, or interest in, land, which right or interest the Government claimed and claims it possessed before it utilized the same. If the Government's claim is unfounded, a property right of plaintiff was violated; but the cause of action therefor, if any, is one sounding in tort; and for such, the Tucker Act affords no remedy. *Hill* v. *United States*, 149 U. S. 593, which both in its pleadings and its facts bears a strong resem-

blance to the case at bar, is conclusive on this point. See also *Schillinger* v. *United States,* 155 U. S. 163. The case at bar is entirely unlike both the *Lynah Case* and the *Cress Case.* In neither of those cases does it appear that, at the time of taking, there was any claim by the Government of a right to invade the property in question without the payment of compensation. Under such circumstances it must be assumed that the Government intended to take and to make compensation for any property taken, so as to afford the basis for an implied promise. And when the implied promise to pay has once arisen, a later denial by the Government (whether at the time of suit or otherwise) of its liability to make compensation does not destroy the right in contract and convert the act into a tort. In both of those cases the facts required the implication of a promise to pay. But here the Government has contended since the beginning of the improvement that, at the time of the dredging in 1899 and in 1909, it possessed the right of navigation over the land in question; which right of navigation, if it existed, gave it the right to dredge further in order to improve navigation. The facts preclude implying a promise to pay. If the Government is wrong in its contention, it has committed a tort. The United States has not conferred upon the District Court jurisdiction to determine such a controversy. See *Cramp & Sons* v. *Curtis Turbine Co.,* 246 U. S. 28, 40–41.

The District Court, instead of rendering judgment for the United States, should have dismissed the suit for want of jurisdiction.

*Judgment reversed and case remanded to the District Court with directions to dismiss it for want of jurisdiction.*

(MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.)