Gkaham, Judge,
delivered the opinion of the court:
The plaintiff as trustee in bankruptcy of the Metz Company seeks to recover the value of certain property which he claims was, prior to the bankruptcy of the company and while owned by it, illegally removed from its possession and appropriated by the defendant to its own use.
The Metz Company had a cost-plus contract with the defendant by which it was to purchase and manufacture certain material and be reimbursed by the defendant for the cost involved plus a profit of 10 per cent on the amount of the cost. This contract provided that the material purchased by the plaintiff and paid for by the defendant should become the property of the latter. The property here in dispute had been purchased under the original contract by the Metz Company, and at the time of the execution of the terminating contract hereinafter mentioned was in its possession and so continued for a short time thereafter.
The defendant had a right under the contract to terminate it at any time, and under a notice from it shortly after the armistice production ceased except the work of completing unfinished articles. Negotiations extended over some months involving the investigation of certain claims of the Metz Company, among which were claims for idle labor prior to the execution of the original contract, expenditures for increased facilities, loss of profits due to change in specifications, and the difference between a profit of 12% per cent on estimated cost and 10 per cent on actual cost, all of which prior to the execution of the terminating contract the defendant had rejected and refused to allow and pay. The court has found that none of the latter claims has been proved.
The negotiations ended in a terminating contract dated June 18, 1919, which was signed by the representative of the Metz Company and by Captain Wiley, a contracting officer for defendant. It was based primarily upon the report of an accounting officer, Air Service, which recommended the payment of $1,926,018.10 as the total amount due the Metz Company and included payment for the material on hand which had been purchased and was in possession of the said company, amounting to $313,533.03, the inventory price, and $81,353.30 profit thereon.
*541 An examination of the contract will show that it covered vouchers numbered 1 to 333-B, inclusive, and the court has found that the aforesaid disputed claims were not included in these vouchers; no vouchers were ever issued for them, nor were they mentioned in the negotiations by Miller, the negotiating officer of the defendant, to any of his superiors, including Captain Wiley, who executed the contract. They were only discussed with Loring, the superintendent of the Metz Company. They are not mentioned in the contract.
The contract recited “ that the amount represented by said vouchers [i. e., 333-B] is the entire amount that has become due or can become due from the Government to the contractor under the original contract except such amounts as are hereinafter specifically provided for.” It recited also an indebtedness to the Torrington Company for $13,000 and agreed to indemnify the contractor against the claim. It then stated that the payment of the sum named, with the assumption of the Torrington claim, “ shall constitute full and final compensation for all articles of work delivered, services rendered, and expenditures incurred by the contractor under the original contract, except as herein otherwise expressly provided.” By Article IY of the contract the contractor agreed to assign, “ remise, release, and forever discharge the Government of and from all manner of debts, dues, sum or sums of money, accounts, reckonings, claims, and demands whatsoever due -or to become due in law or equity under or by reason of, or arising out of, said original contract,” except a claim for $9,689.04, interest payments, which the contractor was given the right to prosecute.
The Government therefore settled with the Metz Company on the basis of the 333-B vouchers; the sum fixed was in payment thereof, and these vouchers, with the Torrington claim, covered full and final compensation for all work done under the contract and all expenditures made. The contractor by signing the contract gave a complete acquittance to the Government, reserving only the right to prosecute the claim for interest, which was afterwards paid by defendant. This claim for interest was, therefore’, the only claim which, under the express terms of the contract, the contractor *542 could assert against the Government. The sum paid by the Government covered specifically the 333-B claim; the acquittance covered all claims. As stated, in the sum paid by the Government was included $313,533.03, inventory price of the material on hand, and $31,353.30 for profits on the same, which material plaintiff claims the defendant after-wards removed from the premises of the Metz Company, and for the value of which this suit is brought. The contract contained the following provision: “All of the raw material and other property scheduled in said report shall remain the property of the contractor.” According to this provision the raw material on hand and other property were to remain the property of the contractor despite the fact that in receiving the sum paid by the defendant as full consideration under the contract it was being paid for this same material. In other words, while the defendant paid for the material with one hand, without any reason or consideration appearing on the face of the contract, with the other hand it gave back the same material to the contractor.
The contracting officer who signed the contract stated that he did so in the belief that it contained a clause providing that the material on hand should become the property of the Government, as it was customary to insert such a provision in all settlements of cost-plus contracts. No mention was made by the said Miller of any settlement of the said claims, upon which payment had been so refused, to the contracting officer, Capt. S. M. Wiley, or to anyone else, at the time of the execution of the terminating contract, and the said claims are not mentioned or alluded to therein. The disposition, or settlement, as to the transfer of the property mentioned in Article V thereof was not discussed by the said Miller or Loring with anyone except between themselves.
It is plain that the contracting officer did not examine or probably even read the contract before executing it, and the same may be said of the adjustment board which approved it. It is also clear that had this officer properly discharged his duty and examined the contract this clause would not have been in it when it was executed and this suit would
*543 probably not be here. He states that he would not have signed the contract had he known that it contained this clause. The transfer of the property to the Metz Company by the said clause and its insertion in the contract were mistakes. The view is borne out by the circumstances which occurred after the execution of the contract. The Government took possession of and removed the material without protest from the Metz Company, and the latter thereafter presented a bill for storage charges for the material during the period from the execution of the contract to the date of removal. The Government also asserted claims against the Metz Company for shortage in the material, and at no time did the Metz Company assert title to the material under the aforesaid provision of the contract. After the company became insolvent, its trustee in bankruptcy for the first time asserted the claim upon which this suit is brought. Just when it was first asserted by the trustee does not appear, nor is it shown just when the Metz Company became bankrupt. It was apparently more than a year after the execution of the contract. The fact is, however, that the Metz Company and those conversant with the matters in dispute here never claimed title to the material removed, and even the lawyer who attempted to collect the claim for storage stated in a letter to the Government that the word “ contractor ” in the provision quoted was clearly a mistake and should have been “ Government.”
In view of the conclusion herein stated, that we have no jurisdiction, it becomes unnecessary to discuss and decide the question of the reformation of the settlement contract, though we would have no difficulty from the findings in reaching the conclusion that it could be reformed.
At the time of the removal of the property the defendant claimed title to and ownership of it, and, in the belief that it was its property, removed it from the possession of the Metz Company without objection by the latter. Under these circumstances, of course, there was no express contract obligating the defendant to pay for the property. The plaintiff’s claim, therefore, is based upon an implied contract on the assumption that the Metz Company was the owner of the property at the time of the removal thereof.
*544 Inasmuch as the defendant took possession of and removed the property, claiming ownership thereof, no implication of a promise to pay arose. The very circumstance of the taking and removal of the property negatives an implication of a contract to pay. Tempel v. United States, 248 U. S. 121, 129; Ball Engineering Co. v. J. G. White & Co., 250 U. S. 46, 57; John Horstmann Co. v. United States, 257 U. S. 138, 146; and Klebe v. United States, 263 U. S. 188, 191. It is also to be observed that if this was not a taking it was a conversion and a tort for which the Government was clearly not liable. This disposes of the plaintiff’s right to recover in this court.
We are of opinion that plaintiff’s petition should be dismissed, and it is so ordered.
Moss, Judge; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.