**BARR et al. v. SPALDING, U. S. Dist. Engineer.**

District Court, W. D. Kentucky, at Louisville. Oct. 6, 1927.

On Final Submission Jan. 11, 1928.

Gordon & Laurent, of Louisville, Ky., for plaintiffs.

T. J. Sparks, U. S. Atty., of Louisville, Ky., for defendant.

DAWSON, District Judge.

This case is before me on motion of the defendant to dismiss plaintiffs' bill. Accepting the allegations of the bill as amended as true, which I must do for the purposes of this motion, if the plaintiffs are entitled to any relief, it is quite clear that a court of equity alone can grant it, as there is no remedy at law. Hill v. United States, 149 U. S. 593, 13 S. Ct. 1011, 37 L. Ed. 862; Tempel v. United States, 248 U. S. 121, 39 S. Ct. 56, 63 L. Ed. 162; Ball Engineering Co. v. White & Co., 250 U. S. 46, 39 S. Ct. 393, 63 L. Ed. 835; United States v. North American Co., 253 U. S. 330, 40 S. Ct. 518, 64 L. Ed. 935; Baltimore & Ohio Railroad Co. v. United States, 261 U. S. 592, 43 S. Ct. 425, 67 L. Ed. 816; Sutton v. United States, 256 U. S. 575, 41 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403; Klebe v. United States, 263 U. S. 188, 44 S. Ct. 58, 68 L. Ed. 244; Horstmann Co. v. United States, 257 U. S. 138, 42 S. Ct. 58, 66 L. Ed. 171; Section 24, Paragraph 20, Judicial Code (28 USCA § 41(20); Section 145, Judicial Code (28 USCA § 250).

I very much doubt if the plaintiffs in this case own the land under the river all the way to the thread of the stream. The title to the bed of a navigable stream is a question of local law, and in Kentucky, ordinarily, the riparian owner holds title to the thread of the stream. The presumption is that it was the intention of his grantor to convey title to the thread of the stream, but that presumption may be overcome by the language of the instrument by which he takes title. In this case the deed recites that the line runs to "the low water mark of the Ohio River; thence down said river, with the low water mark thereof, 1309 feet, more or less, to Blankenbaker's line."

It is clear from this language that it was not the intention of the grantor to convey to the plaintiffs the land below low-water mark. The language used clearly excludes the idea that it was the intention of

their grantor to convey to the plaintiffs to the thread of the stream. Compare St. Louis v. Rutz, 138 U. S. 226, 11 S. Ct. 337, 34 L. Ed. 941; Allen v. Weber, 80 Wis. 531, 50 N. W. 514, 14 L. R. A. 361, 27 Am. St. Rep. 51; Hanlon v. Hobson, 24 Colo. 284, 51 P. 433, 42 L. R. A. 502. This situation, however, does not deprive the plaintiffs of their general riparian rights, as these rights have their origin, not in the ownership of the bed of the stream, but in the ownership of the upland or fastland contiguous to the stream. Illinois Cent. R. R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018; Mobile Dry-Docks Co. v. Mobile, 146 Ala. 198, 40 So. 205, 3 L. R. A. (N. S.) 822, 9 Ann. Cas. 1229; Morrill v. St. Anthony Falls Water-Power Co., 26 Minn. 222, 2 N. W. 842, 37 Am. Rep. 399.

Plaintiffs do, undoubtedly, have title to that portion of the bed of the stream above low-water mark. This title, however, is not an absolute one, but a qualified one, being subject to the paramount power of the national government to control and, within the limitations of the Fifth Amendment, improve same for navigation purposes.

As to the bed of a navigable stream, the national government, for navigation purposes, has unrestrained power, so long as the exercise of that power does not amount to a taking of some part of the riparian owner's land not burdened with the servitude in favor of the national government. Therefore, while we see it frequently stated that a riparian owner is entitled to the unobstructed flow of a navigable stream in its natural state, that rule cannot be so applied as to make the national government liable to the riparian owner for raising the level of the stream within its bed, so long as such raise does not result in the taking, by overflow, etc., of some portion of the owner's land not embraced in what may properly be termed the bed of the stream, and therefore not subject to the paramount right of the government.

For a considerable part of each year a substantial portion of the bed of most navigable streams is not covered by water at all, yet it certainly cannot be the law that, if the national government, in the interest of navigation, so raises the level of the water as to keep this part of the bed always submerged, this would be a taking for which the government would be liable, if such raising of the level of the stream did not cause the river to overflow some portion of the riparian owner's land not included in the river bed. It therefore becomes important to have a cor-

rect understanding of what constitutes the bed of a navigable stream. Certainly the term cannot be confined to that portion of the soil which at all times is covered by water. If so, then all the surface above the extreme low-water mark would be fastland of the riparian owner, free of any servitude in favor of the national government, although there might be a considerable space between this low-water mark and the summit of the banks of the stream, which during the greater part of the year would be submerged. If the title of the riparian owner to this strip is not subordinate to the rights of the government, then the owner could take possession of this land and cover it with buildings or other obstructions which the government would be powerless to remove without compensating the owner. If such were the law, riparian owners could absolutely destroy the usefulness of some navigable streams which get very low in the summer and fall, by erecting structures on both sides down to low-water mark, thereby so restricting the channel as to make it impracticable for commerce to use it. The suggestion of this possibility is sufficient to cause us to reject any claim that the bed of the stream, subject to the paramount authority of the government, is only that portion lying below low-water mark. Neither do I think that those portions of the banks which are submerged only in time of extraordinary high water can be treated as a part of the bed of the stream, so as to have impressed thereon the servitude in favor of navigation.

Gould on Waters (3d Ed.) § 45, in discussing this question, says: "The banks are the elevations of land which confine the waters in their natural channel when they rise the highest and do not overflow; and in that condition of the water the banks and the soil which is permanently submerged form the bed of the river. The banks are a part of the river bed, but the river does not include lands beyond the banks which are covered in times of freshets or extraordinary floods."

The Supreme Court of the United States, in the case of State of Alabama v. State of Georgia, 23 How. 505, 515, 16 L. Ed. 556, it seems to me gives a workable rule for determining how much of the banks of a navigable stream may be treated and considered as a part of its bed. The court said: "The bed of the river is that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water; and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn."

In the case of Haight v. City of Keokuk, 4 Iowa, 199, the Supreme Court of Iowa defined the "bed of a river" as follows: "If we divide a river into its parts, it consists of banks, bed, and water, and the bed includes the shores; for, to constitute a part of the bed, it is not necessary that it should be always covered by water, yet in order to obtain intelligible terms for different parts, it is often divided into banks, shores, bed, and water, still the shore is a part of the bed, or bottom of the river. It is probable that confusion and misunderstanding of cases has arisen from the use of this term 'bed' of a river, in different senses, sometimes in its broad and true sense, and sometimes in a limited one, meaning only that part which is always covered by water."

In Paine Lumber Co. v. United States (C. C.) 55 F. 854, 864, the court, in speaking of the bed of a river, said: "The bank of a river is that elevation of land which confines the waters of the river in their natural channel when they rise the highest, and do not overflow the banks. And, in that condition of the water, the banks, and the soil which is permanently submerged, form the bed of the river. The banks are a part of the river bed."

In Town of Ravenswood v. Flemings, 22 W. Va. 52, 46 Am. Rep. 485, the "beds of rivers" are defined as follows: "The beds of course include the shores and the whole space through which the stream flows."

In Gibson v. United States, 166 U. S. 269, 17 S. Ct. 578, 579, 41 L. Ed. 996, the court said: "All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various states, and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the federal government by the constitution."

Starting, then, with the premise that the riparian owner's title to the bed of a navigable stream is subordinate to the paramount power of the national government to control and improve the stream for navigation purposes, I think we must conclude that this servitude in favor of the government extends, not only to that portion of the soil continuously submerged by the stream in its natural state, but also to that portion of the soil above low-water mark, and below the ordinary and usual high-water mark, com-

monly spoken of as the shore and banks of the stream, as this territory, as between the government and the riparian owner, in my judgment must be treated as the bed of the stream. I think it necessarily follows that within these limits the government may raise the level of the stream without violating the Fifth Amendment, provided, of course, this does not result in overflowing the fastland of the owner not subject to the servitude in favor of the government, or does not result in destroying his riparian rights in a nonnavigable tributary, as was the case in United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746.

It is not clear from the bill whether the overflow complained of is of a part of the shore and bank constituting a part of the bed of the river, as herein defined, or of lands of the plaintiffs not included in the bed of the stream. If of the first character alone, plaintiffs have no right to complain; if of the latter character, they have. Fairly construed, plaintiffs' bill may be interpreted as alleging that the government is claiming the legal right to permanently submerge plaintiffs' land between the ordinary and usual high-water mark and the summit of the bank of the stream. From statements made in the argument on the motion to dismiss, however, I am not entirely clear that such is the government's contention. If the government does not claim any such right, but admits the paramount right of the owner in this respect, then the law would create an implied promise on the part of the government to pay any damage arising from its taking, for which a suit at law can be maintained. Therefore, the matter will have to be developed further, either by pleading, stipulation or proof, before I can determine the motion to dismiss.

As to the threatened damage to their residence, through slips in the banks and the necessity of constructing a retaining wall, I am satisfied that this would not be a taking within the meaning of the Fifth Amendment. The Supreme Court has consistently held that the Fifth Amendment to the Constitution restrains the United States from taking private property for public use without just compensation, but that the acts complained of must amount to a taking, as distinguished from damage; and this distinction must be observed in applying the constitutional provision. Bedford v. United States, 192 U. S. 217, 24 S. Ct. 238, 48 L. Ed. 414. The Fifth Amendment does not protect a riparian owner against mere damage to his property by virtue of the exercise by the United States government of its paramount power to control and improve navigation. Before the acts of the government amount to a taking, under circumstances similar to those in this case, the real estate of the plaintiffs not burdened with the servitude in favor of the government must be actually invaded by water or other material to such an extent as to effectually and permanently destroy or impair its usefulness, and the invasion must be the proximate result of the acts complained of, and the result must be one which it was reasonably certain would flow from the acts complained of.

The damage feared is a softening of the banks, which may ultimately lead to a slipping of the surface with injury to the plaintiffs' residence and grounds. This is not a taking within the meaning of the Fifth Amendment, but is a remote and consequential damage, for which the government can not be held to answer.

For the reasons herein stated, the motion to dismiss is for the present overruled.

### On Final Submission.

This case is now before me on final submission, and I am satisfied that the bill should be dismissed.

Section 267 of the Judicial Code (28 US CA § 384), which is merely declaratory of what has always been the equitable rule in the federal courts, provides: "Suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law."

Before the answer was filed in this case a motion was made to dismiss the bill, among other grounds, on the theory that the plaintiffs had an adequate remedy at law.

While the bill and amended bill did not make it entirely clear whether plaintiffs were contending that the construction of the dam would cause their land to be overflowed above the ordinary high-water mark, or whether they were contending that the construction of the dam would cause the water to submerge some part of the bank between low-water mark and ordinary high-water mark, on the first hearing to dismiss I accepted plaintiffs' pleadings as contending that some part of their land above ordinary and usual high-water mark and below the summit of the bank would be permanently submerged, and that the government was contending that it had the paramount title to this territory, in the exercise of its right to improve the stream for navigation. In my opinion I held that,

in view of the uncertainty of the government's attitude as to its right in improving navigation to permanently submerge that portion of the plaintiffs' land, I could not definitely say that plaintiffs had an adequate remedy at law, and therefore I overruled, for the time being, the motion to dismiss, leaving the parties free to further develop their respective contentions. Since this case has been developed, however, by completing the pleadings and the proof, the entire record clearly shows that the only thing the government contends for is its paramount right, in the interest of navigation, to raise the level of the stream to the ordinary high-water mark. As stated heretofore, I am satisfied the government has this right.

 The government does not undertake to contend, but on the contrary the entire record shows that the government admits, that, if the construction of the dam has resulted in raising the water above the ordinary high-water mark on plaintiffs' property, to that extent there has been an unlawful invasion and taking of the property of the plaintiffs. Such an admission creates an implied obligation to pay the damage sustained. Indeed, as the government is prohibited by the Fifth Amendment to the federal Constitution from permanently submerging plaintiffs' lands above the ordinary high-water mark without compensating him, the law itself creates an implied promise to pay damages, in event of such submergence, irrespective of the claim of government officials, and this damage can be recovered in a suit at law in the proper District Court of the United States, if the amount thereof does not exceed $10,000, and in the Court of Claims, if in excess of that amount. In the trial of such a case the issues would be whether or not the land above ordinary high-water mark had been submerged and the amount of the damage. A contest on these two points, however, would not be equivalent to a claim on the part of the government that it has a right to submerge such land without compensating the owner.

The necessary result of the situation, then, is this: If the taking complained of is of that portion of the bank between low-water mark and ordinary high-water mark, plaintiffs cannot complain either in a court of equity or in one of law. If it is of that portion of the bank above high-water mark, there is an implied promise to pay, for which a suit at law can be maintained.

Therefore, in either event the case is not cognizable in a court of equity, and the motion to dismiss will be sustained.