Nichols, Judge,
delivered the opinion of the court:*
This is an action to recover just compensation under the Fifth Amendment on account of acts of the Army Engineers in dredging a channel and constructing a dike with the excavated material, all on plaintiff’s submerged lands in Cass County, Illinois. Plaintiff calls this a taking of some seven acres for the channel, and 5.6 for the dike, and in addition it claims damage by consequential silting to its remaining submerged land. Defendant says the action is barred by our disposition of a prior suit by the same plaintiff and by the easement paid for and granted in settlement thereof. We find it unnecessary to resolve this issue fully. We consider decisive for defendant the facts that, as we conclude, the project was in aid of navigation and involved the invasion of land under navigable waters only.
The facts have been found by Trial Commissioner C. Murray Bernhardt, and the parties have not excepted to them other than in exceptions by defendant. The challenged findings were premature in the present juncture of the case as they related to the extent of consequential damages by silting, assuming a taking, and the damage issue was severed for further proceedings under Rule 47 (c). The issues before us now are issues of law. However, in order to pose them properly it is necessary to state the undisputed facts in some detail.
Plaintiff’s land, partly upland and partly submerged, fronts to the north on the Illinois River, a concededly navigable stream, and its larger southern portion consists [or consisted before the acts constituting the alleged cause of action] of a combination of islands in, and land under the waters of, a body known as Muscooten Bay. The old natural channel of the Sangamon River enters the Illinois at Mile 98 on the latter, which then flows in easy curves in a general southwesterly direction past plaintiff’s tract on its southeast side at Mile 92, to the town of Beardstown, Illinois, just *426 below Mile 89. Just above Beardstown, and fronted by the town on the down-stream side, a gap in the east bank opens into Muscooten Bay, which widens out among a broad profusion of islands, sloughs, shoals, and swamps, part the property of plaintiff, part of other owners. There was but a narrow tongue of land between the Biver and the Bay below and for several miles above plaintiff’s frontage. They were connected by an artificial cut, and in flood times River water flowed south right over the tongue into the Bay. From the Bay, eastward, Hager Slough led into Coleman Lake. Other interconnected sloughs and lakes lay north of them.
Plaintiff, and other sportsmen’s clubs owning tracts east and west of plaintiff’s, all used the land only for duck hunting and fishing, uses for which it was well adapted.
In its natural state Muscooten Bay had over most of its area sufficient depth for moderate sized watercraft, say five to six feet. As to its actual use for navigation, that appears to have been once substantial. The parties stipulated that an octogenarian resident of Beardstown, too ill to come to court, would have testified as follows:
I have lived in Beardstown for eighty years and have Personal knowledge that Muscooten Bay, Wood Slough, angamon Bay and Hager Slough areas have been navigated by the general public all my life; that I at one time ran steamboats in this area; that I caught tons of fish in this area, which were often shipped to New York for sale; that my father before me ran large boats through this area; that in the earlier 1900’s, during periods of high water, we would float logs from Chandlersville, Illinois, to the sawmill located on the southern part of Muscooten Bay, by going through Muscooten Bay.
The other bodies of water referred to were all connected with and reached through Muscooten Bay. Chandlersville is on the Sangamon. Other testimony, so far as it went, corroborated the above, but the other witnesses, being younger, were in any case in no position to contradict this octogenarian. At the level of Muscooten Bay the present bed of the Illinois passes through a former lake, but now the sloughs and lakes on the other side of the river are cut off by levees. In flood time the free passage of Illinois River water over the tongue of land into Muscooten Bay has a marked effect in slowing *427 the velocity of the current and thus facilitating navigation at such times.
Accordingly, the evidentiary support for finding 5 is substantial and that finding establishes that in former times Muscooten Bay was in fact navigated and navigable. Compare, e.g., United States v. Holt State Bank, 270 U.S. 49 (1926), (Mud Lake in Minnesota).
In 1949 the Sangamon Biver had become choked below Mile 6.5 (i.e., 6.5 miles above its mouth) with silt, trees, and debris, and the Army Engineers embarked on a Congressionally approved project to give the waters a new outlet. They dug a ditch which runs from Mile 6.5 on the Sangamon to Hager Slough. Thus the waters of the Sangamon henceforward would reach the Illinois via Muscooten Bay. While the ditch is known as “The New Sangamon” at least to the Engineers, and while it permits passage of the Engineer’s own equipment and occasional other small craft to the part of the natural Sangamon above Mile 6.5, its primary purpose, according to the Project Engineer, was to relieve flooding of bottom lands on the Sangamon. The Engineers correctly anticipated that deltas of deposited silt would appear west of the ditch exit, but they hoped, too, that a scour effect of the current would keep open a channel for passage of the water. Plaintiff’s submerged land was a distance west of the western end of the ditch but by 1957 the delta had begun to encroach upon it. Plaintiff then brought a suit in this court (Ct. Cl. No. 307-57) which the Government settled in 1959 by paying plaintiff $17,500 and taking a deed which granted an easement “to overflow, flood, silt, submerge, and scour” plaintiff’s lands. As the delta continued to grow, -the Engineers, without further dealing with plaintiff, in 1961 dredged in it the ditch which is the subject of the present suit. The object was to provide a channel deep enough for the Engineer’s watercraft, dredges and a barge, to pass up to the “New Sangamon.” It passes across plaintiff’s submerged land through the delta in a southwesterly direction. They cut into the newly deposited silt, not the former natural bottom. They deposited the spoil to form a dike on the south bank of the cut. Since then the delta forming effect has continued and plaintiff has lost a substantial part of its land as concerns *428 its use for duck bunting and fishing, which appears to be the highest and best use. Plaintiff and its witnesses believe the dike throws more silt on its land north of the dug channel than would occur without the dike. This is hard to establish except speculatively and a finding on it is not needed now. The silting continues to shoal the water until the delta portion is either upland, which permits willow trees to grow, or is so little under that the shoalest boat cannot pass. As one witness succinctly put it, such land is becoming “too dry for ducks and too wet to plow.” The scouring effect is felt also, and accomplishes the Engineer’s purpose to a substantial extent, but they do not rule out a future necessity for further dredging. It is perhaps unnecessary to add, the activities described have not invaded or put any additional burden on any of plaintiff’s land above normal Illinois Eiver high water level. The Engineers did not consider the new ditch necessary for mere drainage.
We now turn to the applicable law. Having ascertained that in former times Muscooten Bay was in fact navigable and navigated, we draw the legal conclusion that it was part of the navigable waters of the United States. United States v. Appalachian Electric Power Co., 311 U.S. 377 (1940); The Daniel Ball, 10 Wall. (77 U.S.) 557 (1870). Logging and fishing (See Iowa-Wisconsin Bridge Co. v. United States, 114 Ct. Cl. 464, 508-9, 84 F. Supp. 852, 866 (1949), cert. den. 339 U.S. 982 (1950)) are sufficient navigation uses, so the case does not turn on the unexplained use of the waters by steamboats. The testimony quoted above might be shaky if contradicted, but uncontradicted it sustains the burden we have ruled the Government is under to prove the navigability of waters not previously so held. Iowü-Wisconsin Bridge Co., supra. The case for navigability does not turn, therefore, on the admitted navigability of the Illinois except, of course, that the Illinois furnishes the access to the system of inland interstate navigable waters, which is a requisite. The Robert W. Parsons, 191 U.S. 17 (1903). If Muscooten Bay had no history of navigation of its own, as a separate geographical entity, its receipt of Illinois River waters in time of flood and its then effect on the navigation of the main channel, might raise an issue, which as matters are we need *429 not pass on. The navigation easement is not limited to the thread of the stream where vessels pass, but extends from ordinary high water on one side to ordinary high water on the other. Barr v. Spalding, 46 F. 2d 798 (W.D. Ky., 1928).
Illinois is part of the old Northwest Territory, and particularly there the rule is well established that a body of water does not lose by subsequent disuse the character, once acquired, of being part of the system of Federal navigable waters. Economy Light & Power Co. v. United States, 256 U.S. 113 (1921). The Supreme Court in that case attributed the result to clauses in the Northwest Ordinance of 1787 declaring that the system of navigable waters then existing should remain public highways in perpetuity. It is needless to restate the whole case here. The body of water then in litigation, the Des Plaines Eiver, had become wholly unused for navigation, being blocked by dams and fixed bridges, but these the Court thought were nuisances that could be abated whenever the Congress decided to restore the actual navigation of the river. Page 118. In United States v. Appalachian Power Co., supra, the Court held that a stream outside the Northwest Territory likewise did not lose its navigable character by disuse. Thus, the fact here that Muscooten Bay had ceased to be so much navigated by 1949 is not of legal significance. And it does not appear, like the Des Plaines, an instance of total cessation.
The Government has an inherent easement in navigable waters up to mean high water, in the exercise of which it may erect works for navigation which impair the interests of the owner of the upland, without incurring Fifth Amendment liability. United States v. Chicago, M., & St. P. R.R. Co., 312 U.S. 592 (1941); Willink v. United States, 240 U.S. 572 (1916). This includes the right to dredge. Temp el v. United States, 248 U.S. 121 (1918). Private ownership of the stream bed, under Illinois law, makes no difference. Temped, supra, at p. 129. Plaintiff established fairly that the “New Sanga-mon” was primarily for flood control, not for the passage of vessels. The work now in litigation, being supplementary to the original project, is for the same ends; however, plaintiff is in error in attaching legal significance to this showing. We have held that flood control works in the Mississippi *430 Eiver Basin are for navigation. Kirch v. United States, 91 Ct. Cl. 196 (1940). We said at p. 202:
* * * In the flood-control legislation and in the acts of the Government designed to carry out * * * .such legislation, the Government assumed the lead and took upon itself the effort of controlling the flood waters of the Mississippi Eiver for the purpose of improving the navigability of that river and for the purpose of protecting as much land and property along the Mississippi from the ravages of floods as far as it was feasible and possible to do so. * * *
See also 33 U.S.C. sec. 701a, declaring that “destructive floods upon the rivers of the United States * * * impairing and obstructing navigation * * * constitute a menace to national welfare * * *.” Acc. United States v. West Virginia Power Co., 56 F. Supp. 298, 302 (S.D. W. Va., 1944). It is clear that all success in controlling floods in that area aids navigation, because, as the record now before us shows, it is lack of control of floods that admits silt, logs, snags, and debris into the navigable streams. The navigation easement enables the Government, under the comerce clause, to employ submerged lands under navigable water for a variety of purposes helpful to commerce, including flood control. United States v. Appalachian Power Co., supra, at p. 426. The works herein, separately considered, may have impaired navigation of Mus-cooten Bay; indeed, the Army Engineers seem to expect to fill the entire Bay with silt eventually, except for the one clear channel. But the Congress, and those to whom it has delegated authority, may, without Fifth Amendment liability, employ land submerged under navigable water in the way that in their best judgment helps to accomplish the overall purpose even if, intentionally or not, they impair navigation for some purposes in some areas. United States v. Commodore Park, Inc., 324 U.S. 386 (1945). In Gibson v. United States, 166 U.S. 269 (1897), the Government was held not liable for constructing a dike in navigable waters which obstructed access by boats to plaintiff’s upland. Friend v. United States, 30 Ct. Cl. 94 (1895), is very similar in its facts to the case at bar. The Government had cut an artificial waterway, creating new currents which silted up the river in front of plaintiff’s land, preventing access to his wharf. We held that *431 tbe United States was not liable in a Tucker Act suit. Muck as we may regret the destruction of unspoiled natural game and fishing areas in navigable waters, the remedy lies in the hands of Congress, not the courts.
It is not necessary to consider in depth whether the Government in the 1959 settlement also purchased the right to do all that it did, or its defense that the 1959 judgment is res judicata. The language of the 1959 settlement documents suggests that those who negotiated it may have thought they were dealing with a claim for invasion of plaintiff’s upland; the grant of an easement to “overflow” and “submerge” certainly implies this and is hardly appropriate for a claim such as we now have for damage to land already overflowed and submerged. The physical facts developed in the instant record do not show any way in which the Engineers’ work could have occasioned any subjection of plaintiff’s upland to flooding or silting beyond what might sometimes occur naturally when the Illinois was in flood; then, it would appear that plaintiff’s upland would be entirely under water. Both before and after the engineering work at issue, the level of water in Muscooten Bay would always have to be substantially the level of the Illinois River. The court raised sua sponte at the oral argument the question whether the judgment might be res judicata against the defense that the waters were navigable. On the whole we think the former settlement in its various parts is not completely and finally determinative either against the present claim or against the defendant’s substantive law defense. It appears to have dealt with a different subject matter.
In view of the foregoing, the plaintiffs’ petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner 0. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a nonprofit Illinois corporation, with its property located in Gass County, Illinois.
2. Plaintiff owns a tract of land in Cass County, Illinois, as described in the petition, part of it having been acquired in 1927 and the balance in 1950. The land is subject to an *432 easement in favor of the defendant described in finding Y, infra.
3. The plaintiff’s property is located in a backwater or swampy area lying generally southeast of and within a bend in the Illinois River, which area consists of dry land, sloughs, bays, inlets and rivulets. At seasonal high 'stages of the Illinois River the low areas of land are submerged. Prior to 1949 the Sangamon River traversed the general area (not including plaintiff’s tract) in a roughly north-northwesterly direction, debouching into the Illinois River at the top of the bend. Prior to 1949 the bed of the Sangamon River at a point 6.5 miles below its mouth was congested with debris, snags, logs, etc., which caused the river to overflow its channel during times of heavy precipitation or spring runoff, and to run indiscriminately through a large area of swampy land, flooding bottom farmlands. Except when congested with debris, the Sangamon River was a natural, navigable waterway.
4. In 1941 the Corps of Engineers recommended to Congress the construction of a new channel for the Sangamon River which, instead of following the natural channel, would divert the waters of the Sangamon River at mile 6.5 above its mouth into a ditch to be excavated running in a general westerly direction to Hager Slough, at the head of Coleman’s Lake, from which the water could exit into the Illinois River at Beardstown. ITager Slough and Coleman’s Lake are due east of plaintiff’s property. About September 194Y the Corps of Engineers commenced a drainage project, hereafter referred to as the Sangamon Ditch,[1] which consisted of a ditch approximately 6y2 miles long running from mile 6.5 on the Sangamon River in a generally westerly direction to Hager Slough at the head of Coleman Lake. The Sanga-mon Ditch was about 200 feet wide and varied in depth from 14 feet at the upper end to zero where it emptied into Hager Slough. The material which was removed in cutting the Sangamon Ditch was thrown up along either side as a spoil bank. Sangamon Ditch, which was completed in Au *433 gust 1949, dropped the water table and relieved the farm area to the east of mile 6.5 of periodic flooding as it was designed to do. In effect, it created a new channel for the Sangamon River from mile 6.5 on the latter, diverting it in a westerly direction from its historic and natural northerly direction. These directions are approximate only. The Sangamon Ditch was an artificial waterway, traversing property which theretofore had not been a waterway. The project occupied land to the east of plaintiff’s property, but did not cross or touch upon lands owned by plaintiff.
5. Prior to 1949 much of the areas contained within and in the vicinity of the plaintiff’s property, such as Muscooten Bay, Baujan Swale, and Pinn Oak Flats, were navigable bodies of water and easily traversable by boats drawing about three feet of water for fishing and hunting purposes. In earlier times commercial fishermen fished these waters, using steam-propelled boats and motor boats, and putting out seven or eight thousand yards of seine to catch 120 to 130 pounds of fish a day for shipment to outlying markets. At one time logs were floated down Muscooten Bay to a sawmill at the southern shore.
6. The Sangamon River, and its 1949 extension through the Sangamon Ditch, carries a great deal of silt at times of heavy precipitation or spring runoffs. The ability to carry silt is a function of the current or flow of the stream. As the current slows down, the suspended silt precipitates, first the heavier particles and then the light particles. As the silt-bearing water poured down the Sangamon Ditch and entered the relatively still waters of Hager Slough and Coleman’s Lake it lost the force of its current and dropped its silt load, thus creating a delta formation at that point. Completion of the Sangamon Ditch in 1949 accelerated the rate of siltation. Traces of siltation in the area of Hager Slough began to appear in 1950. A marked delta had formed at the head of Hager Slough by 1957 where the right bank of the Sangamon Ditch was breached and the water came through to drop heavy deposits of silt in the still water at that point. By 1957 also a large delta had formed at the foot of Hager Slough and the terminus of the Sangamon Ditch entering Muscooten Bay on plaintiff’s property. Aerial photographs *434 of the area taken in 1938, 1950, 1957 and 1963 demonstrate graphically the encroaching pattern of siltation which had occurred. By 1957 siltation appeared to be progressing around several islands on the plaintiff’s property.
7. On July 10, 1957, the plaintiff filed a petition in this court (No. 307-57), seeking compensation for the depreciation in the value of its property for fishing and duck-hunting due to the siltation which had occurred as the result of the completion of the Sangamon Ditch in 1949. Paragraphs 1-8 and 10 of that petition were identical with the first nine paragraphs of the petition in the present case. The earlier case was settled in January 1959 pursuant to a Stipulation of Settlement, which latter provided in paragraph 6:
It is, therefore, stipulated and agreed that the sum of $17,500, inclusive of interest, is intended to and does cover all damages and all claims of any kind and character to which the plaintiff may be entitled as a result of any and all things mentioned and set out in its petition and constitutes just compensation for the taking of the easement to flood and deposit silt on plaintiff’s land.
The settlement was approved by an order of the court entered on January 21, 1959, which stated that the sum of $17,500 was “in full settlement of all claims set forth in the petition”. On March 13,1959, a perpetual right-of-way easement was recorded whereby the plaintiff conveyed to the United States—
* * * the perpetual right, power, privilege, and easement occasionally to overflow, flood, silt, submerge, and scour the [plaintiff’s property].
The easement reserved to the plaintiff—
* * * all such rights and privileges as may be used and enjoyed without interfering with or abridging the rights and easements hereby acquired; the above estate is conveyed subject to existing easements for public roads and highways, public utilities, railroads and pipelines.
,8. By 1961 the deltas which had formed at the top of Hager Slough through the breach in the right bank of Sang-amon Ditch, and at the bottom of Hager Slough into Mus-cooten Bay, had deteriorated the channel of the Sangamon *435 Ditch to tbe point where the flow of water and silt was impeded. To correct this situation and to direct the flow of the Sangamon Ditch so as to carry its water and silt into a natural drainage system, namely, the nearby Illinois River, it was deemed by defendant necessary to extend the channel of the Sangamon Ditch by dredging a channel through the large silt delta which had formed in Muscooten Bay on plaintiff’s property. In 1961 and 1962, without prior notice to or permission of the plaintiff, the defendant entered upon plaintiff’s property, removed snags from the channel, and dredged an extension of the Sangamon Ditch channel through the large delta that had accumulated on plaintiff’s property in Muscooten Bay. The new channel extended in a westerly and southwesterly direction through the said delta, terminating on property adjoining plaintiff’s. The excavated spoil was thrown up on the left side of the channel to permit the natural flow of the Sangamon Ditch to get through and establish a channel of its own which it could continue to maintain itself. All of the work was performed within the ordinary high water lines. The new channel dredged in 1961-1962 covered about 7 acres on plaintiff’s property, plus approximately another 5y2 acres occupied by the spoil bank.
9. The primary purpose of the dredging of the new channel in 1961-1962 was to maintain good drainage for the Sang-amon Ditch to avoid continual flooding and induce it to carry its silt load out to the Illinois River. The dredged material was deposited on the south side of the dredged channel to induce the channel to construct its own water course. There was no spoil bank erected on the north side of the new channel which would have tended to prevent the silt-laden waters of the Sangamon Ditch from flooding over the northern part of plaintiff’s property. The engineering principle was that, during high water stages, water from the Illinois River would enter at the north end of plaintiff’s property through an artificial cut, which had been there many years, and would form a current across plaintiff’s property in a southerly direction to join the current flowing through the extended channel of the Sangamon Ditch, thus assisting it to flow out into the Illinois River south of plaintiff’s property.
*436 10. Another purpose of the dredging of the channel on plaintiff’s property in 1961-1962 was to maintain channels for boats to get through for hunters and fishermen using the navigable waters of the area. By 1963 the navigable waters in the area were considerably restricted in extent and depth compared to prior years, because of the heavy siltation which had occurred, with concentrations greater in some locations than in others.
Conclusion or Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on its claim and the petition is dismissed.

While we disagree with the conclusion reached by Trial Commissioner C. Murray Bernhardt, we are indebted to him for the assistance afforded by his able opinion and have adopted his Findings of Fact with one omission.

 Referred to here as the Sangamon Ditch to differentiate it from that part of the Sangamon River from mile 6.5 to its mouth. After 1949 the Sangamon Ditch actually constituted the artificial balance of the Sangamon River, replacing the lower 6.5 miles of the original Sangamon River.