(Nos. 3353, 3354, 3355, 3356, 3357, 3358, 3359, consolidated—

JOE McCOMB AND JAMES McCOMB, No. 3353, ALBERT JACOBS AND FAYE JACOBS, No. 3354, ED. P. SMITH, No. 3355, OSCAR LAMORE AND ZEPHYR LAMORE, No. 3356, ARTHUR BENOIT, No. 3357, ALFRED GIROUX AND LEONARD GIROUX, No. 3358, HENRY P. WRIGHT, E. BELLE WRIGHT, EDWARD WRIGHT AND MILTON WRIGHT, No. 3359, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed June 10, 1941.*

JOHN H. BECKERS, for claimants.

GEORGE F. BARRETT, Attorney General; MURRAY F. MILNE, Assistant Attorney General, for respondent.

Mr. Justice Linscott delivered the opinion of the court:

The above entitled cases are all claims for damages caused by the pollution of a stream known as Rock Creek, by the Manteno State Hospital; all grew out of the same state of facts, and therefore, upon motion of the several claimants have been consolidated for the purposes of the hearing and consideration thereof.

The Manteno State Hospital is a charitable institution operated and maintained by the State of Illinois through its Department of Public Welfare. It is located on 1,220 acres of land owned by the State, located in Sections 22, 23, 25, 26, 27 and 35 in Township 32 North Range 12 East of the Third Principal Meridian in Kankakee County.

The institutional buildings are located on Section 26, and the remainder of the land is devoted to agriculture, orchards, nursery, etc. The original buildings and improvements were constructed in 1930, and then consisted principally of the following: eight two-story ward buildings; one administration building; one sewage disposal plant; one power house; two employees' dormitories; five doctors' cottages; one Managing Officer's residence; one farm house; one kitchen building; garages, etc.

In 1933 eight additional ward buildings, a dining room, and a hospital were erected.

In 1935 a kitchen building, a general stores building, and a laundry building were erected.

In 1936 and 1937 twelve ward buildings, one mechanical stores building, one building for tubercular patients, one diagnostic building, two employees' buildings, one assembly hall, seven doctors' cottages, one chief engineer's residence, and two hydro-therapy buildings were erected.

The number of patients and employees housed on the premises from 1935 to 1939 inclusive, were as follows: in 1935, 1,446; in 1936, 3,144; in 1937, 3,187; in 1938, 4,451; and in 1939, 6,093.

The sewage from the several buildings is carried through an 18-inch sanitary sewer which empties into Rock Creek approximately sixty or seventy feet east of the highway running north and south between Sections 22 and 23.

The property is also provided with a 48-inch sewer called a storm sewer, which empties into Rock Creek just west of the 18-inch sewer.

Rock Creek is a natural water course which traverses the northwest corner of Section 23 and continues in a southwesterly and westerly direction through the lands of the claimants, and finally empties into the Kankakee River about seven and one-half miles west and two miles south of Manteno; and the effluent from the sewage disposal plant and the storm sewer system of the institution empties into such creek. The creek is a winding and sluggish stream, twenty-five to thirty feet in width, with many holes in the bottom which catch and retain the sludge and solids from the institution. The fall is about ten feet in the first three and one-half miles, and an additional ten feet in the next mile.

The original sewage disposal plant constructed in 1930 as aforesaid consisted of a primary settling tank, six mechanical aerators; a secondary settling tank; a sludge digester and three sludge drying beds, which were able to take care of a population as follows: primary tank, 1,280; aerator tanks, 2,530; settling tank, 2,670; digester tank, 3,210; sludge beds, 3,760. From February, 1935 until July 20, 1937 the waste water from the institution laundry was discharged directly into the storm sewer system (and eventually into Rock Creek) without passing through the sewage disposal plant. Since July 20, 1937 the waste water from the laundry has been run through the sewage disposal plant, and after treatment therein, is discharged into Rock Creek along with other effluent from the plant, through the sanitary sewer.

The original plant was put into operation in 1931, and thereafter no provisions were made for any alterations therein or additions thereto until December 29, 1938, when a contract was let for the installation of a new primary settling tank, sewage lift station and mechanical bar screen.

The several complaints herein were filed February 3, 1939, and on December 14, 1939 a contract was let for certain alterations and additions to the sewage treatment plant. The alterations and improvements above mentioned had not been completed at the time the taking of testimony herein was concluded, but one of the witnesses for the respondent testified, over objection by claimants, that after the completion of such alterations and improvements the capacity of the sewage dis-

posal plant would be sufficient to take care of a population of 10,000 people, and that with proper operation the effluent from the plant should not possess any offensive odor and should not render the stream unfit for cattle to drink or to stand in. The witness admitted that such results would depend upon the proper construction of the plant, and the proper operation thereof, and that in any event, even with the new alterations and improvements the stream would not be in its natural state.

Alfred A. Brensley, a sanitary engineer called by the claimants, stated that in his opinion if the plant were constructed according to the plans in evidence, it would not furnish sufficient treatment to insure the original uses which were afforded by the creek waters before the original plant was constructed; and that the effluent discharged from the plant would reduce the extent of the available uses of the creek as to the riparian owners for general farming purposes and dairying.

No attempt is made by the respondent to deny or excuse the conditions as they existed prior to the filing of the several complaints herein. The sewage disposal plant in use prior to the filing of such complaints was wholly inadequate to treat the sewage and effluent from the institution, and all of such sewage and effluent was and continued to be discharged into the waters of Rock Creek.

In short, the respondent created and thereafter maintained a public nuisance of an aggravated nature. The supply of water in Rock Creek was not only increased in volume but polluted as well.

After the alterations and additions hereinbefore referred to are completed, the effluent from the entire institution will continue to be emptied into Rock Creek, and the evidence of Dr. Hinton, the Managing Officer of the hospital, was to the effect that from 1934 to the time of the hearing, from 150 to 200 gallons of water per person per day were consumed at the hospital. All of such water was eventually emptied into Rock Creek by the respondent, so that in 1939 there was from 900,000 to 1,200,000 gallons of water per day emptied into Rock Creek through the sewers of the institution.

The claimants, Joe McComb and James McComb, do not own the land they farm, but are tenants in possession thereof. In their complaint herein such claimants seek an award for

$1,405.00, for the following items of damages, to wit: decrease in milk production; the cost of extra feed for livestock; loss of livestock; and the cost of veterinary services.

The claimants, Albert Jacobs and Faye Jacobs, are the owners of the land involved in their claim, and the claimant, Ed P. Smith, is the tenant in possession of said land. In the original complaint filed by Albert Jacobs and Faye Jacobs, damages are claimed in the amount of $980.00 for the loss of rent, and for the cost of excavating and hauling away slime, sludge and sediment which had accumulated in the bottom of Rock Creek. By amendment thereafter made, such claimants added the item of depreciation in the fair cash market value of their property, for which they asked an additional award in the sum of $2,000.00.

The claimant, Ed P. Smith, in his complaint asks for damages in the sum of $915.00 for depreciation in the value of livestock, loss of livestock, decrease in milk production, cost of extra feed for livestock, and cost of veterinary services.

The claimants, Oscar LaMore and Zephyr LaMore, are the owners of the land involved in their claim, but Oscar Lamore alone farms the land, and he is the sole owner of the livestock thereon. In their original complaint Oscar LaMore and Zephyr LaMore, claim damages in the sum of $2,000.00 for loss of rent, and for the cost of excavating and hauling away slime, sludge and sediment which had accumulated in the bottom of Rock Creek, and the claimant, Oscar LaMore, personally claims damages in the total amount of $2,795.00 for loss of livestock, loss of use of livestock, decrease in milk production, cost of extra feed for livestock, and cost of veterinary services. By amendment thereafter made to their complaint, said claimants added the item of depreciation in the fair cash market value of their property for which they asked additional damages in the sum of $7,200.00.

The claimant, Arthur Benoit, does not own the land he farms, but is a tenant in possession under Carl Becker, the owner thereof, and claims damages in the sum of $1,102.50 for decrease in milk production; cost of extra feed for livestock, and cost of veterinary services.

The claimant, Alfred Giroux, is the owner of the land involved in Claim No. 3358, and the claimant, Leonard Giroux, is the tenant in possession thereof. In their original com-

plaint the claimant, Alfred Giroux, claims damages in the sum of $1,325.00 for loss of rent and cost of excavating and hauling away slime, sludge and sediment which had accumulated in the bottom of Rock Creek, and the claimant, Leonard Giroux, claims damages in the sum of $1,392.50 for loss of livestock, depreciation in the value of other livestock, decrease in milk production, and cost of extra feed for livestock. By amendment thereafter made, the claimant, Alfred Giroux, added the item of depreciation in the fair cash market value of his property, for which he asked additional damages in the sum of $6,000.00.

The claimants, Henry P. Wright, E. Belle Wright, Edward Wright and Milton Wright, are the owners of and operate the land involved in their claim. In their original complaint they claim damages in the sum of $3,516.00 for loss of rent, cost of excavating and hauling away slime, sludge and sediment which had accumulated in the bottom of Rock Creek, decrease in milk production, and cost of extra feed for livestock. By amendment thereafter made, claimants added the item of depreciation in the fair cash market value of their property, for which they asked additional damages in the sum of $5,000.00.

The evidence produced on behalf of the several claimants shows that those portions of the farms in question traversed by the creek were devoted to pasture; that since the pollution of the stream commenced, such farm land has depreciated in value; that livestock standing in the creek or drinking the water therefrom became diseased; that some of the stock died and that some of it depreciated in value because of the sores which developed on the animals; that by reason of the polluted condition of the stream it became necessary to remove the livestock from the pasture along the creek during the summer months of each year when the condition of such creek was most objectionable, and that during these months, and due to the inability to use these pastures, the occupying claimants were compelled to use or obtain extra feed for the livestock; that due to their removal from the pasture and the diseased condition of the livestock, the milk production of the occupying claimants fell off, and that they therefore lost the sale of certain quantities of milk that ordinarily would have been available for such purposes; and that it was necessary,

in some instances, to secure the services of veterinaries in efforts to relieve or cure the livestock.

The respondent contends:

1. That as a matter of law these claims present a situation in which the State is not liable to respond in damages for the reason that the State is not liable for the negligent acts or omissions of its officers, agents or employees; that if the officers, agents or employees of the State by their acts or omissions have polluted Rock Creek and have created a continuing nuisance, the remedy of the plaintiff is by injunction to restrain the continuance thereof; that the State is not liable in tort for damages arising from the creation or continuance of such nuisance; that no award can be made on the claims predicated upon tort liability.

2. That where the injury complained of constitutes a public nuisance, the provisions of Section 13 of Article 2 of the Constitution which provides that private property shall not be taken or damaged for public use without just compensation, has no application; that the Criminal Code makes the pollution of a stream a public nuisance, and that therefore the right to maintain and continue such public nuisance cannot be obtained by the payment of compensation or damages; that the constitutional provisions embrace only those cases in which the Act creating the damage is a lawful act and which by the payment of compensation, can therefore be lawfully maintained; that the aforementioned constitutional provision has no application to this case, and that the claimants cannot predicate their right of recovery thereunder; that their remedy was to abate the nuisance in its inception.

3. That even if a liability exists under the constitutional provision, claimants who are tenants have not offered any evidence to establish a proper measure of damages; that the evidence shows that the tenants occupied the land in question under leases which were renewed from year to year; that no evidence as to depreciation of the value of their leasehold was presented and that in any event it would be competent only as to the lease which was in existence when the injury arose; that subsequent leases or renewals after the creek was polluted were made with a knowledge of that fact and its effect on the land in question, and such facts were taken into consideration in the execution of subsequent leases or renewals.

4. That upon the completion of the improvements now in progress or contemplated, the creek will no longer be polluted by the sewage from the hospital, and that therefore the pollution of a stream is not a permanent condition, and that the claimants who are the owners of land are not entitled to recover permanent damages therefor.

It is clear that the State in the construction, maintenance and operation of Manteno State Hospital is engaged in a governmental function; also that the State in the exercise of its governmental functions is not liable for the negligence or misconduct of its officers, servants and agents under the doctrine of respondeat superior, in the absence of a statute making it liable. *Minear* vs. *State Board of Agriculture*, 259 Ill. 549; *Gebhardt* vs. *Village of LaGrange Park*, 453 Ill. 234; *LePitre* vs. *Chicago Park District*, 374 Ill. 184; *Finney* vs. *State*, 8 C. C. R. 327; *I. C. R. R. Co.* vs. *State*, 10 C. C. R. 410; *Bishop, et al.* vs. *State*, 10 C. C. R. 664.

In this case, however, the claimants are not relying upon any negligent acts or conduct on the part of the officers, agents or employees of the respondent. It is not claimed that the sewage disposal plant in question was improperly constructed, but it is claimed that although the facilities for disposal of sewage were sufficient at the time the institution was erected, and continued to be sufficient for some time thereafter, yet, the institution grew so rapidly both as to the number of buildings and the number of people quartered therein, that it was but a short time until the facilities for the disposal of sewage were inadequate and insufficient, and the several complaints are based upon the action of the State in casting additional waters into the stream, and in polluting the same, to the damage of the claimants as hereinbefore set forth.

Section 13, Article 2 of the Constitution provides that "private property shall not be taken or damaged for public use without just compensation." It seems elemental that the words "private property" are words of general application, and that they cannot be confined to any species of property, either real or personal. In the case of *Metropolitan City Railway Co.* vs. *Chicago City Railway Co.*, 87 Ill. 317, our Supreme Court, on page 324, said:

"Property, in its broadest and most comprehensive sense, includes all rights and interest, in real and personal property, and also in easements.

franchises, and incorporeal hereditaments. That which may be taken for public uses is not exclusively tangible property."

So also, in the case of *I. C. R. R. Co.* vs. *Commissioner of Highways*, 161 Ill. 247, the Supreme Court, on page 250, said:

"'Property,' in the sense in which that word is thus used in the constitution, is that dominion or indefinite right of user and disposition which one may lawfully exercise over particular things or subjects, and generally to the exclusion of all others."

In Volume 6, Words and Phrases, page 5693, the law is set forth as follows:

"Property is nomen generallissimum, and extends to every species of valuable right and interest, including real and personal property, easements, franchises, and other incorporeal hereditaments."

In Volume 3, Words and Phrases, 2d series, page 1275, the author cites the case of *I. C. R. Co.* vs. *State*, ex rel, 94 Miss. 579, in support of the following proposition, to wit:

"The term 'property,' as used in Const. 1906, Art. 3, Sec. 17, providing that an individual's property shall not be taken or damaged for public use, except on due compensation first made, includes every species of value, right or interest."

We are of the opinion, therefore, that the constitutional provision protects the individual in the ownership of all of its property whether the same be real or personal.

One of the earliest cases in this State bearing upon the questions here involved was the case of *Nevin* vs. *City of Peoria*, 41 Ill. 502. In that case the City of Peoria in raising the grade of a street directed the flow of water from its natural channel to a new channel, and thereby the house and grounds of the plaintiff were flooded with mud and water and a stagnant pond was formed within a short distance from his house, rendering it unhealthy and ruining his business. The defendant contended, as in this case, that there was no liability on the part of the City of Peoria.

In disposing of such contention the court said, page 508:

"The city is the owner of the streets, and the legislature has given it power to grade them. But it has no more power over them than a private individual has over his own land, and it cannot, under the specious plea of public convenience, be permitted to exercise that dominion to the injury of another's property in a mode that would render a private individual responsible in damages, without being responsible itself. Neither State nor municipal government can take private property for public use without due compensation, and this benign provision of our Constitution is to be applied by the courts whenever the property of the citizen is invaded, and without reference to the degree." Also, on page 515: "We are unable to see why the property of an individual should be sacrified for the public convenience

without compensation. We do not think it sufficient to call it damnum absque injuria. We know our Constitution was designed to prevent these wrongs: We are of the opinion, that, for injuries done to the property of the appellant in the case before us, by turning a stream of mud and water upon his premises, or by creating in the immediate neighborhood of his dwelling an offensive and unwholesome pond, if the jury find these things to have been done, the city of Peoria must respond in damages."

The case of *Holm* vs. *Cook County,* 213 Ill. App. 1, was a case very similar on the facts to the case at bar. In that case the Oak Forest Infirmary, a county institution which furnished a home and refuge for about 3,000 inmates and employees, conducted its sewage through the farm tiling of the plaintiff and across his premises, causing damage similar to that complained of in this case. In that case the county of Cook took the same position as is being taken by the Attorney General in this case, and in disposing of such contention the court, on page 4, said:

"It is insisted by plaintiff that the action here brought is one to recover compensation for the wrongful taking of and damage to his lands and tiling system for a public use without compensation. Defendant, on the other hand, argues that, being a municipality in the exercise of its governmental functions, an action in tort will not lie against it.

"So far as the *form* is concerned, if an action does lie against Cook County for the injuries complained of, trespass on the case is the appropriate one. *Bradbury* vs. *Vandalia Levee & Drainage Dist.,* 236 Ill. 36; *Allen* vs. *City of Decatur,* 23 Ill. 332.

"The paramount question here presented for determination is, whether any action will lie against Cook County under the facts hereinabove related.

"Section 13 of the Bill of Rights (Const. Ill. of 1870, Art. II) provides that 'private property shall not be taken or damaged for public use without just compensation'; that 'such compensation, when not made by the State, shall be ascertained by a jury, as shall be prescribed by law.' "

"It will be seen, from an examination of the declaration, that when defendant constructed the said Oak Forest Infirmary, it contemplated that all sewerage was to be conducted from its lands into the Calumet Drainage District Ditch, by means of plaintiff's said tiling system, which was in fact done. Such action was tantamount to an appropriation not only of plaintiff's lands for this purpose, but also the tiling system which plaintiff had laid for purposes entirely foreign to the one to which defendant put it. While it is true, as argued by defendant, that the servient estate must yield to the dominant one in carrying off surface waters, etc., yet such right cannot be enlarged to permit the defendants herein to unlawfully appropriate plaintiff's said tiling system for the purpose of conducting the entire sewerage of the institution in question through plaintiff's lands. In our opinion, plaintiff's declaration sets up a state of facts from which it appears that his said property has been both taken and damaged for public use without compensation."

In the case of *Highland* vs. *Auer*, 235 Ill. App. 327, the plaintiff Auer sought an injunction to restrain the City of Highland from polluting certain waters whereby sewage was deposited upon the lands of said plaintiff. In considering the rights of the plaintiff under the Constitution, the court in that case said:

"Our Constitution guarantees to every citizen that his property shall not be taken or damaged for public use without just compensation. Art. 2, Sec. 13. It protects him against damages caused by a nuisance."

The case of *Cook* vs. *City of DuQuoin*, 256 Ill. App. 452, is another case which, on the facts, is almost identical with the case at bar. In disposing of the question there involved, the court said (page 455):

"It is the right of every owner of land over which a stream of water flows, to have it flow in its natural state, and with its quality unaffected. It is a part of the freehold of which the owner cannot be disseized except by due process of law, and the pollution of a stream constitutes the taking of property, which may not be done without compensation."

In considering the effect of the aforementioned constitutional provision, our Supreme Court in the case of *Roe* vs. *County of Cook*, 358 Ill. 568, said:

"Section 13 of Article 2 of the Constitution, principally relied upon in support of the judgment, is as follows: 'Private property shall not be taken or damaged for public use without just compensation. Such compensation, when not made by the State, shall be ascertained by a jury, as shall be prescribed by law,' etc. It is contended by plaintiff in error that the Constitution does not point out a remedy and that no express remedy is afforded by statute. From this it is argued that the parties damaged are left to the common law for relief, and that no liability exists at common law against an involuntary municipal corporation (such as the County of Cook) to respond in damages for a tort, in the absence of a statute creating such a liability. (*Board of Trustees of Odell* vs. *Schroeder*, 58 Ill. 353; *County of Cook* vs. *City of Chicago*, 311 id. 234.) On the other hand, the defendants in error argue that the constitutional provisions above quoted are self-executing, and that a county may not take or damage the property of an individual for public use without eminent domain proceedings and without compensation and then escape liability for its act by saying that it cannot be sued. We are impressed with the justice and soundness of the latter view. The constitutional right of all property owners to a compensation when their property has been damaged or taken for public use is one of the most salient provisions of our bill of rights." * * *

"When the Constitution forbids the taking or damaging of private property without just compensation and points out no remedy, and no statute affords one, for the invasion of the right of property thus secured, the common law, which affords a remedy for every wrong, will furnish the appropriate action for the redress of such grievance." * * *

"The constitutional provision itself, without remedial legislation, is basic law, which not only confers a right but pre-supposes a remedy. Standing alone, Section 13 is self-executing and forms the basis for recovery at common law by an action on the case." * * *

"Counties may sue and be sued in Illinois, (Cahill's Stat. 1933, Chap. 34, Secs. 22, 31) and while they may not be held liable for damages in tort actions, where the doctrine of respondeat superior must be invoked, they are nevertheless liable for the value of property appropriated to their own use and for damages done to abutting property by reason of public improvements made in pursuance of their corporate powers." * * *

"It is now immaterial whether the declaration be considered as one in tort or in assumpsit, as the breach of duty relied upon is the same and it contains all the necessary averments of fact for an action in assumpsit."

The case of *Barrington Hills Club* vs. *Barrington*, 357 Ill. 11, was another case in which the facts were very similar to those in the case at bar. In that case the plaintiffs were riparian owners of lands who sought an injunction against the village of Barrington to prevent such village from discharging sewage and the efflux from its sewage treatment plant, into the creek above their premises. In that case the court said, page 18:

"The claim cannot be sustained that the Village of Barrington had an inherent right to use the creek as the only available natural watercourse to carry off its sewage and waste water." * * *

Also, on page 19: "Here, in addition to the placing of an additional burden upon the servient estates of defendants in error, as lower riparian owners, through the drainage of water coming from the water system and deep wells supplying water to the village, another property right is invaded, viz., by pollution of the stream."

The Supreme Court of the United States has held in numerous cases that a claim for compensation for property taken for public use by the Federal Government is a claim founded upon an implied contract. *Phelps* vs. *U. S.*, 274 U. S. 341; *North American Transfer Co.* vs. *U. S.*, 253 U. S. 330; *Temple*, 248 U. S. 121.

The cases cited would seem to be conclusive of the right of the several claimants to recover, under the provisions of the Constitution, such damages as they have sustained, limited, however, to the allegations of their several complaints, the testimony in the record, and the law governing the proper measure of damages in cases of this kind.

The respondent, however, contends that the conditions complained of constitute a public nuisance in violation of the provisions of Section 221 of the Criminal Code of this State which provides that it is a public nuisance "to corrupt or

render unwholesome or impure the water in a stream, river, pond or lake, to the injury or prejudice of others''; that inasmuch as the same constitute a public nuisance the State cannot obtain the right to continue such nuisance by paying damages to the plaintiffs and that therefore the plaintiffs are not entitled to recover in this case. If such contention were sound, it would follow as a necessary consequence that if the State causes pure water to flow upon the lands of the claimants which such lands would not ordinarily receive in the course of nature, and thereby adds to the burden upon such lands, the claimants would be entitled to maintain an action therefor, but if the waters so cast upon the lands of the claimants are of such a nature that the stream is polluted thereby and a public nuisance created, the claimants would have no remedy therefor.

We are not impressed either with the soundness of this contention or the justice thereof; nor are we impressed by the further contention of the respondent that the claimants are limited in their remedy, to the abatement of the nuisance. Our courts in numerous cases have held that in cases of this character, a suit for damages and the abatement of the nuisance by injunction are concurrent remedies.

In the case of *Barrington Hills Club* vs. *Barrington*, ante (357 Ill. 11) our Supreme Court said:

"The law in Illinois is, and has long been, settled upon the controlling questions involved in this case. A private nuisance may be enjoined by a suit in equity or the party suffering damage and injury may proceed at law, and the remedies are concurrent and not exclusive. (*Springer* vs. *City of Chicago*, 308 Ill. 356; *Village of Dwight* vs. *Hayes*, 150 id. 273; *City of Kewanee* vs. *Otley* 204 id. 402.)

On the question of damages, Lewis on Eminent Domain, Second Edition, Volume 2, page 1416, Section 653b, lays down the following rule:

"Where a suit is brought for damages to property by the construction, use or operation of a work for public use, the question arises whether all damages, past, present and prospective, must be recovered in a single suit, or whether the damages must be limited to those sustained prior to the commencement of the suit, leaving future damages to be redressed by future suits, as such damages occur. If there can be but one suit and one recovery it necessarily follows; first, that the measure of damages is the diminution in the value of the property by reason of the permanent continuance of the construction or use which causes the damage;" etc. * * * "On the other hand if there may be successive actions then, first, the measure of damages is the injury sustained up to the commencement of the suit;" etc. * * * "and successive actions may be brought as often as damages are sustained or

injury done and a recovery had of all damages sustained subsequent to the prior suit."

It is well settled in this State that where the injury in question is of a permanent character, all damages arising on account thereof, past, present and prospective, must be recovered in one proceeding; but where the injury in question is not of a permanent character, but is continuing, damages may be recovered only up to the time of the commencement of the proceeding, and successive actions may be maintained from time to time as damages are inflicted. *City of Centralia* vs. *Wright*, 166 Ill. 561; *Suehr* vs. *Chicago Sanitary District*, 242 Ill. 496; *Strange* vs. *C. C. C. & St. L. Ry. Co.*, 245 Ill. 246; *Jones* vs. *Sanitary District of Chicago*, 252 Ill. 591.

It therefore becomes necessary to determine whether the injury involved in this case is of a permanent or a continuing character.

In the case of *Baker* vs. *Leka*, 48 Ill. App. 353, the court, in considering the question as to whether a certain ditch constituted a permanent invasion of the plaintiff's rights, said:

"This is not to be determined from a consideration alone of its enduring character, or that if not changed by the hand of man it would likely continue forever. To be permanent in a legal sense, a structure must, in addition to being permanent or enduring within itself, be such that its continuation is lawful; because if not lawful, it is subject to be removed or abated by a legal proceeding and therefore cannot be deemed permanent." * * * "A nuisance which may be abated by law is not regarded as a permanent source of injury but as a continuing nuisance. Successive actions for damages occasioned by it may be maintained from time to time as such damages are inflicted." * * *

In the case of *City of Kewanee* vs. *Otley*, ante, the court, on page 412, said:

"The principle of law which contemplates that damages sustained for a permanent injury to land shall be recovered in one action is applicable only to those cases where the party or agent committing the injury acts within the authority of the law. In this case, when the sewage of the defendant city, or any part thereof, though combined with sewage or deleterious waters from other sources, was cast upon the lands of appellees or mingled with the waters of a stream running over the same, so that a nuisance was created as to appellees and they were injured thereby, such act of the defendant was unlawful and it could not be sanctified by time. Nor could it be said that such a nuisance was a permanent one, for it would be the duty of its authors to have it abated."

The case of *Jones* vs. *Sanitary District of Chicago*, 252 Ill. 591, was a case in which the plaintiff sought to recover damages which he claimed had been done to his lands during

the period of five years prior to the commencement of his suit, as the result of the overflowing of such lands by the defendant. It appeared in that case that the damage to the plaintiff's lands was not the result of the construction of the Drainage Canal, but that such damage resulted from the use made of such canal, and the court there held that where the continuance and operation of a permanent structure are not necessarily injurious, but may or may not be so, that the injury is not considered a permanent injury, and only the damages sustained prior to the commencement of the suit may be compensated in that proceeding.

In Lewis on Eminent Domain, Volume 2, page 1422, the author says:

"In suits for the pollution of a stream with sewerage, it was held that the recovery should be limited to damages up to the commencement of the suit."

We are of the opinion, that under the facts in this case the nuisance in question cannot be considered a permanent nuisance within the meaning of those words as used in cases of this kind. The buildings of the respondent which constitute the Manteno State Hospital, although permanent structures, do not, of themselves, constitute the nuisance complained of. Such nuisance consists of the discharge of the waters and sewage from such institution upon the lands of the claimants. The discharge of such sewage upon the lands of the claimants constitutes a public nuisance in violation of the Criminal Code of this State and being unlawful, cannot ripen into or form the basis of a right to continue or maintain such nuisance. Furthermore, the testimony offered on behalf of the respondent shows that a very substantial enlargement or addition to the sewage treatment plant is now under construction; and that upon the completion thereof the effluent from the Manteno State Hospital will be unobjectionable and will not constitute a public nuisance. Under the testimony in the record, we are of the opinion that the nuisance in question, being unlawful, cannot be considered as of a permanent character, but on the contrary, must be considered as a continuing nuisance.

There are some cases in this State in which the owners of land have treated a structure as a source of permanent injury and brought suit for and recovered both present and future damages, although such structure was unlawful and

subject to abatement by legal action. This was upon the theory that where the structure is in its nature permanent, the one damaged thereby may elect to treat it as permanent in law, though he may abate it as a nuisance and may sue for and recover damages present and prospective. If he does so, he is to be regarded as having consented to its continuation and is estopped from the recovery of further damages. *Baker* vs. *Leka,* 48 Ill. App. 353; *Strange* vs. *C. C. C. & St. L. Ry. Co.,* 245 Ill. 246; *Dowd* vs. *Drainage District,* 160 Ill. App. 476; *Bernhardt* vs. *B. & O. Ry. Co.,* 165 Ill. App. 408.

Such cases, however, are limited to cases involving structures which are in their nature permanent and in which it is apparent that the injury will continue indefinitely. In this case, as previously stated, the source of injury was not the hospital buildings, which are permanent structures, but the depositing of the sewage therefrom on the lands of the claimants. Furthermore, it is apparent that the pollution complained of will not continue indefinitely, as the evidence shows that a substantial enlargement of the sewage treatment plant is now in course of construction. Consequently, the cases last cited can have no application to the claims now under consideration.

In the recovery of the damages sustained by them, the claimants are therefore confined to the damages which they have sustained up to the time of the commencement of the present proceeding, and no recovery can be had in this proceeding for any permanent injury to the real estate, that is to say, the damage claimed for depreciation in the fair cash market value of the real estate is not a proper element of damage in this proceeding.

Some of the property owners claim as an element of damage the cost of removing the sediment from Rock Creek. Whether such cost is a proper element of damages it is not necessary to decide at this time, as the evidence offered is too indefinite, uncertain and speculative to form the basis of an award. The testimony shows that the creek is winding and of varying widths, and that there are holes in the bottom which are filled with such sediment, but there is no evidence to show the distance the creek traverses the several tracts, or the width of the creek on each of such tracts. There is some general testimony to the effect that the creek is from 25 to 30 feet in width, but there is nothing definite as to any par-

ticular piece of property, nor is there any definite testimony as to the thickness of the deposit of sediment on the several tracts, or the number or the size of the holes in the bed of the creek. Apparently the estimates of the owners with reference to the amount of such sediment and the cost of removal thereof were merely guesses, and not based upon any definite measurements or information either as to the amount of the sediment or the cost of removal.

There is some testimony to the effect that after the new addition to the sewage treatment plant is in operation, the effluent from the institution will be unobjectionable, and the flood waters will wash away all old sediments, and there is also testimony to the effect that the flood waters will have no effect upon the removal of such sediment. Even if such item were a proper element of damage, it would be necessary that the testimony disclose some definite basis upon which an award could be made, and in the present state of the record, we are of the opinion that no award can be made for such item.

The respondent also contends that the tenants who leased their property subsequent to the time Rock Creek was first polluted, are not entitled to recover any damages in this proceeding, for the reason that the nuisance was in existence at the time they went into possession of the property, and therefore they must be held to have leased the property subject to the conditions as they then existed.

This is the rule which applies in cases of a permanent injury, but such rule has no application in cases where the injury complained of is of a continuing rather than a permanent character. *Baker* vs. *Leka*, 48 Ill. App. 353, 360.

In the present claims the tenants had a right to assume that the nuisance, being unlawful, would be abated.

As to the damages claimed by the occupying claimants, the respondent contends that there is no competent evidence to support such claims. It goes without saying that in cases of this kind the exact amount of the damages sustained is difficult to ascertain, but that fact of itself does not deprive the claimants of their rights to recover therefor.

The case of *Johnson* vs. *City of Galva*, 316 Ill. 598, was a case very similar to the case at bar upon the facts. The plaintiff there sought to recover damages for the pollution of a natural watercourse which ran across his farm. The items

of damages claimed by him were similar to those sought by the claimants herein. In fact, it seems probable that the claimants in this case in preparing their claims for damages followed the authority of the Johnson case.

In that case, in considering the question of damages, the court said, page 603:

"It is further contended by the plaintiff in error that the items for (1) the cost of hay and grain fed to the cows of the defendant in error while confined to the barn lot because of the pollution of the waters of the creek, (2) the alleged resulting loss of milk, and (3) the cost of labor and the value of the defendant in error's time in driving his horses to and from water, were purely speculative and conjectural and for that reason are not proper elements of damage. If by reason of the wrongful acts of which the defendant in error complained he sustained these items of damage they were proper elements to be submitted to the jury. Damages must, however, be the proximate result of the wrong of which complaint is made. Where the right of recovery exists the defendant cannot escape liability because the damages are difficult of exact ascertainment. The nature of the inquiry in the instant case is such that it is difficult, if not impossible to ascertain with mathematical certainty the amount of the defendant in error's damages, but this difficulty affords no answer to a cause of action which results from a breach of duty imposed by law. The unliquidated damages growing out of the commission of a tort are seldom susceptible of exact measurement. The rule is, that while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence which the subject will admit is receivable, and this evidence is often nothing better than the opinions of persons well informed upon the subject under investigation."

We now come to the consideration of the amount of damages to which the claimants are entitled under their several complaints, the proof in the record, and the law as hereinbefore set forth.

Claim No. 3353, Joe McComb and James McComb. These claimants are tenants on the farm described as the Southeast Quarter (SE¼) and the South Half (S½) of the Northeast Quarter (NE¼) of Section Twenty-nine (29), owned by Mrs. Grace Cooley. Claimants have lived on this farm for five years and have fourteen head of cattle. During the years 1936, 1937 and 1938 these claimants had to take their livestock out of the pasture during the months of June, July and August of each year on account of the pollution of Rock Creek, and had to buy additional feed for them. As the result of such pollution and the dry feeding of the livestock on account thereof, claimants' milk production was reduced two hundred (200) gallons per year. The evidence shows that fifteen cents (15c) per gallon was a fair price for such milk, and

that the cost to these claimants of such dry feeding was fifteen cents (15c) per day per animal. The evidence also shows that these claimants lost one horse and two cows during the month of August, 1939, and that at that time they paid Thirty Dollars ($30.00) in veterinary fees. The complaint in this case was filed February 3, 1939 and consequently under the law as hereinbefore set forth, claimants are not entitled to recover anything in this proceeding for the horse and the cows which died, nor for the money paid to the veterinary, for the reason that all of such matters occurred subsequent to the filing of the complaint herein. The damages to which the claimants are entitled in this proceeding must be confined to the damages which accrued prior to the filing of the complaint. These claimants are therefore entitled to an award for the following items of damage, to wit: reduction in milk gallonage, 200 gallons a year for the years 1936, 1937 and 1938, at 15c per gallon, $90.00; extra feed for fourteen head of cattle for seventy-five days a year in each of said three years, at 15c per day, $472.50;—total, $562.50.

Claim No. 3354, Alfred Jacobs and Faye Jacobs. These claimants are the owners of Lots 1 and 3 of Tyson's Subdivision in the East Half (E½) of Section Twenty-two (22). This land adjoins the land owned by Oscar LaMore and Zephyr LaMore. Among other items of damage, claimants sought to recover for the permanent injury to their lands, but in accordance with the views hereinbefore expressed, they cannot recover such damages in this proceeding. Claimants' entire tract consists of approximately eighty-four acres, of which ten acres is leased to the claimant, Ed P. Smith. The testimony in the record shows that this land was rented to Ed P. Smith during the years 1937 and 1938 at a reduction of Sixty Dollars ($60.00) per annum on account of the pollution of the creek. Claimants are therefore entitled to recover this item of damages in the amount of One Hundred Twenty Dollars ($120.00).

Case No. 3355, Ed P. Smith. The testimony in the record confines the loss sustained by Mr. Smith to the year 1937 and to the months of June, July and August of that year. Such testimony warrants an award in favor of Mr. Smith for the following items of damages, to wit: loss on the sale of six head of cattle which ordinarily would have sold for $600.00, but which were sold for $190.00, on account of their condition,

making a loss of $410.00; money expended for medicine for such livestock, $40.00; extra feed for ten cattle for two months at twenty cents per day, $120.00; reduction in milk gallonage, thirty days, eight gallons per day at fifteen cents per gallon, $36.00;—making a total of $606.00. From this amount there must be deducted the sum of $120.00, being the reduction in rent allowed to Smith by his landlord on account of the pollution of the creek.

Case No. 3356, Oscar LaMore and Zephyr LaMore. These claimants are the owners of the Northeast Quarter (NE¼) and the East Half (E½) of the Southeast Quarter (SE¼) of Section Twenty-two (22). This property lies immediately west of the lands occupied by the Manteno State Hospital, and is approximately eighty (80) feet distant from the outlet of the sewers in question. Evidence was offered to show the depreciation in the fair cash market value of this property as the result of the pollution of Rock Creek, but as previously stated, such depreciation does not constitute a proper element of damage in this proceeding. The testimony in the record, however, does warrant an award in favor of the claimant, Oscar LaMore, who operated the farm, for the following elements of damage, to wit: reduction in milk gallonage, 500 gallons a year for each of the years 1935, 1937 and 1938, at fifteen cents per gallon, $225.00; extra feed for twenty-three head of cattle for ninety days in each of the years 1935, 1936, 1937 and 1938, at twenty cents per day, $1,656.00;—making a total of $1,881.00.

There was some testimony to the effect that the claimant, Oscar LaMore, paid $39.00 for veterinary services; that one cow and one colt of said claimant died, and that the mother of such colt became sick and claimant lost the use of such mare. However, neither the testimony of the veterinary nor of the claimant himself shows that the sickness or death of any of such animals resulted approximately from the pollution of Rock Creek, and consequently no allowance can be made for any of such items.

Case No. 3357, Alfred Benoit. This claimant is a tenant in possession of the Southwest Quarter (SW¼) of Section Twenty-two (22), except the North 30.39 acres thereof, which farm is owned by Cark Becker and lies west of the LaMore property. The testimony in the record shows that the claimant is entitled to an award for the following items of damage,

to wit: for reduction of milk gallonage, 250 gallons a year for the years 1936, 1937 and 1938, at fifteen cents per gallon, $112.50; extra feed for ten cows for ninety days in each of the years 1935, 1936 and 1937, at twenty cents per day, $540.00; total, $652.50.

Case No. 3358, Alfred Giroux and Leonard Giroux. The claimant, Alfred Giroux, is the owner of the East Half (E½) of Section Twenty-eight (28) lying north of the Illinois Central Railroad, and Lots Six (6) to Ten (10), both inclusive, in Hilaire Giroux's Subdivision of the West Half (W½) of Section Twenty-eight (28), containing approximately 215 acres; all of which is farmed by the claimant, Leonard Giroux. There is testimony in the record which shows a depreciation in the fair cash market value of this property as the result of the pollution of Rock Creek, but as previously stated, such testimony is not competent in this proceeding. The testimony shows that the claimant, Leonard Giroux, is a tenant on a cash rent basis and pays a rent of $5.00 per acre for the entire farm. Alfred Giroux testified that if it were not for the present condition of the creek, the farm should rent for $8.50 per acre, but on account of the creek he rents it to his son for $5.00 per acre. However, other testimony in the record shows that Leonard Giroux has rented the property since 1934 for $5.00 per acre. No loss on account of the pollution of the creek is claimed prior to 1936, and under the evidence we fail to see that the claimant, Alfred Giroux, up to the time of the commencement of this proceeding, has suffered any loss of rent, or any other damage for which he is entitled to an award in this proceeding. From the evidence in the record it appears that the claimant, Leonard Giroux, is entitled to an award for the following items, to wit: loss of $80.00 on the sale of two cattle which ordinarily would be worth $90.00 each, one of which was sold for $55.00 and the other for $45.00; reduction of milk gallonage, 250 gallons a year for the years 1936, 1937 and 1938 at fifteen cents per gallon, $112.50; extra feed for ten cows for ninety days in each year during the years 1936, 1937 and 1938 at twenty cents per cow, $540.00;—total, $732.50.

There was also some testimony to the effect that one of claimants' cows died and two others became sick, but there is nothing in the record to show that the death of the one cow or the sickness of the others was the proximate result

of the condition of the stream in question, and no allowance can be made for either of such items.

Claim No. 3359. The claimants, Henry P. Wright, E. Belle Wright, Edward Wright, and Milton Wright, are the owners and tenants in common of 134 acres in the Southeast Quarter (SE¼) (west of the railroad) of Section Twenty-one (21), and 44 acres in the Northwest Quarter (NW¼) of the Northeast Quarter (NE¼) of Section Twenty-eight (28), which farm is operated by them as partners. This land is approximately one and one-half miles west of the Manteno State Hospital and is traversed by Rock Creek for a distance of a little over one-half mile. There is testimony in the record as to the depreciation in the value of this farm, but as previously stated, such item of damages cannot be considered in this proceeding. The evidence shows, however, that the claimants have sustained damages and are entitled to an award for the following items, to wit: reduction in milk gallonage of 600 gallons a year during the years 1936 and 1937, at fifteen cents per gallon, $180.00; extra feed for cattle during the years 1936 and 1937, twenty-one cows for ninety days in each year, at twenty cents per day, $756.00;—total, $936.00.

An award is therefore entered in favor of the several claimants as follows:

Claim No. 3353, Joe McComb and James McComb, Five Hundred Sixty-two Dollars and Fifty Cents ($562.50).

Claim No. 3354, Alfred Jacobs and Faye Jacobs, One Hundred Twenty Dollars ($120.00).

Claim No. 3355, Ed P. Smith, Four Hundred Eighty Six Dollars ($486.00).

Claim No. 3356, Oscar LaMore, Eighteen Hundred Eighty-one Dollars ($1,881.00).

Claim No. 3357, Alfred Benoit, Six Hundred Fifty-two Dollars and Fifty Cents ($652.50).

Claim No. 3358, Leonard Giroux, Seven Hundred Thirty-two Dollars and Fifty Cents ($732.50).

Claim No. 3359, Henry P. Wright, E. Belle Wright, Edward Wright, and Milton Wright, Nine Hundred Thirty-six Dollars ($936.00).